**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SILVERSTRAND INVESTMENTS, On Behalf of Itself And All Others Similarly Situated, | ) Civil Action No. _____ ) ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** ) |
| vs. | ) ) |
| AMAG PHARMACEUTICALS, INC., DR. BRIAN J.G. PEREIRA and DAVID A. ARKOWITZ, | ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) |

Plaintiff makes the following allegations, except as to allegations specifically pertaining

to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel

which investigation included analysis of publicly available news articles and reports, public

filings made with the Securities and Exchange Commission ("SEC"), securities analysts' reports

and advisories about AMAG Pharmaceuticals, Inc. ("AMAG" or the "Company"), press releases

and other public statements issued by the Company, and media reports about the Company.

Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      AMAG's primary revenue producing product is the drug Feraheme, which was

approved for sale by the Food and Drug Administration ("FDA") on June 30, 2009. On January

21, 2010, the Company completed a secondary offering (the "Offering") selling 3,600,000 shares

of its common stock (the "Common Stock") for a price of $48.25 per share. Two weeks later, on

February 4, 2010, a securities analyst shocked the market by disclosing that there were "several

patients hospitalized with anaphylactiod reactions to Feraheme . . . [and] one death that may or may not be directly related to Feraheme." In reaction to this news AMAG's stock plunged by over $7.00, or more than 15% from $45.25 per share to close at $38.12 per share damaging Plaintiff and a class (the "Class") consisting of other similarly situated investors who purchased the Common Stock in the Offering. Then, on March 1, 2010, the Company disclosed in a conference call that the Company's previously reported favorable sales report for December 2009 had, in fact, been artificially inflated through the front loading of sales caused by special incentive and rebate programs. On this news, AMAG's common stock declined another $4.02 per share to close at $34.17 per share, representing a total drop of more than $14.00 per share from the $48.25 per share price in the Offering at which the Common Stock was sold for only two months earlier, making for a total decline of almost $50 million in the value of the shares sold in the Offering.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and are brought pursuant to Section 11 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77k].

3. This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v].

4. Venue is properly laid in this District pursuant to Section 22 of the Securities Act. The acts and conduct complained of herein occurred in substantial part in this District.

## PARTIES

5.     Plaintiff Silverstrand Investments purchased AMAG Common Stock, as set forth in the certification attached hereto and incorporated herein by reference, pursuant to the Offering, and was damaged thereby.

6.     Defendant AMAG is a Delaware corporation and maintains its principal executive offices at 100 Hayden Avenue, Lexington, Massachusetts 02421. AMAG is a biopharmaceutical company engaged in the development and commercialization of therapeutic iron compounds to treat anemia in the United States, Europe and Japan. It offers Feraheme, an iron replacement therapeutic agent for the treatment of iron deficiency anemia and used as a diagnostic agent for vascular enhanced magnetic resonance imaging (MRI) to assess peripheral arterial disease.

7.     Defendant Dr. Brian J. G. Pereira ("Pereira") was, at all relevant times, President, Chief Executive Officer and Executive Director of AMAG. Pereira signed the Registration Statement (as defined below).

8.     Defendant David A. Arkowitz ("Arkowitz" and together with Pereira and AMAG, "Defendants") was, at all relevant times, Executive Vice President and Chief Financial Officer of AMAG. Arkowitz signed the Registration Statement (as defined below).

## CLASS ACTION ALLEGATIONS

9.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons other than Defendants who purchased the Common Stock of AMAG pursuant to the Company's Offering on or about January 21, 2010. Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related or affiliated with any

of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

10.     The members of the Class are so numerous that joinder of all members is impracticable. AMAG sold 3.6 million shares in the Offering. The precise number of Class members is unknown to Plaintiff at this time, but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of AMAG or its transfer agent or the underwriters to the Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

11.     Common questions of law and fact exist as to all members of the Class and predominate over any question affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     Whether the Prospectus and Registration Statement (as defined below) issued by Defendants to the investing public in connection with the Offering misrepresented or omitted to state material facts about AMAG and its business; and

(c)     The extent of injuries sustained by members of the Class and the appropriate measure of damages.

12.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same

4

false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

13.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

14.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

15.    AMAG describes itself as a biopharmaceutical company that utilizes proprietary technology for the development and commercialization of a therapeutic iron compound to treat anemia and novel imaging agents to aid in the diagnosis of cancer and cardiovascular disease. AMAG currently manufactures and sells two approved products, Feraheme (ferumoxytol) Injection for intravenous, or IV, use and GastroMARK.

16.    AMAG is dependent on the commercial success of Feraheme, as its SEC filings state in pertinent part as follows:

> Our ability to generate future revenues is solely dependent on our successful
> commercialization and development of *Feraheme*. We currently sell only one
> other product, *GastroMARK*, in the U.S. and in certain foreign jurisdictions
> through our partners. However, sales of Ga*stroMARK* have been at their current
> levels for the last several years, and we do not expect sales of *GastroMARK* to
> materially increase. Accordingly, if we are unable to generate sufficient revenues

from sales of *Feraheme*, we may never be profitable, our financial condition will be materially adversely affected, and our business prospects will be limited.

17.     In October 2009, securities analysts at both J.P.Morgan and Summer Street Research Partners lowered their fourth quarter sales estimates for AMAG.  Summer Street reduced expected fourth quarter sales of Feraheme from $16 million to $7 million and J.P. Morgan estimated fourth quarter revenues at $10 million "to reflect lower confidence in near-term Feraheme utilization in dialysis."  During the month of October, AMAG's common stock price hit a low of $34.35, declining from a July 1, 2009 price of $55.91 per share.

18.     In November 2009, after AMAG reported $3 million in third quarter sales, Summer Street revised its fourth quarter estimates upward to $12 million and J.P. Morgan's expectations remained unchanged at $10 million for the quarter.

19.     On this news, AMAG's shares increased to around $44.00 per share but by mid-December had receded to $37.25 per share.

20.     On January 10, 2010, AMAG issued a press release announcing preliminary Feraheme fourth quarter revenues of between $12 million and $13 million.  On this news, AMAG's stock price climbed to $51.32 by January 14, 2010.

21.     On January 11, 2010, AMAG filed a Form 8-K with the SEC attaching the January 10 press release as an exhibit.

**The Offering**

22.     On or about January 19, 2010, AMAG filed with the SEC a Form S-3/ASR Registration Statement (the "Registration Statement") for the Offering using a "shelf" registration process.  The Registration Statement became effective upon filing.  Pursuant to the Registration Statement as amended by a prospectus (the "Prospectus") dated January 21, 2010, AMAG sold 3,600,000 shares of Common Stock at a price of $48.25 per share for total offering

6

proceeds of $173,700,000.   AMAG granted the underwriters a right to purchase up to an

additional 540,000 shares to cover potential over-allotments.

23.    The Prospectus portrayed the Company's technology in highly positive terms.

For example, the Prospectus stated in pertinent part as follows:

> Our core technology is based on small, coated superparamagnetic iron oxide
> nanoparticles and their characteristic properties. Our core competencies include
> the ability to design such nanoparticles for particular applications, to manufacture
> the nanoparticles in controlled sizes and to cover the nanoparticles with different
> coatings depending upon the application for which they will be used. Our
> technology and expertise enable us to synthesize, sterilize and stabilize these iron
> oxide nanoparticles in a manner necessary for use in pharmaceutical products
> such as IV iron replacement therapeutics and MRI contrast agents.

> Our iron oxide nanoparticles are composed of bioavailable iron that is easily
> utilized by the body and incorporated into the body's iron stores. As a result,
> products using our core technology are well suited for use as an IV iron
> replacement therapy. Additionally, the superparamagnetic characteristic of our
> products result in nanoparticles that become strongly magnetic when placed in a
> magnetic field, but lose their magnetism once the field is removed. Therefore, use
> of our nanoparticles can result in magnetic resonance images that provide
> essential information to the reviewing physician. Our rights to our technology are
> derived from and/or protected by license agreements, patents, patent applications
> and trade secret protections.

24.    The Prospectus discussed the Company's Feraheme product for use in patients

with chronic kidney disease ("CKD"), stating in pertinent part as follows:

> On June 30, 2009, *Feraheme* was approved for marketing in the U.S. by the FDA
> for use as an IV iron replacement therapy for the treatment of IDA in adult
> patients with CKD. In July 2009, we began to market and sell *Feraheme* in both
> the dialysis and non-dialysis markets, including to nephrologists, hematologists,
> dialysis          organizations,          hospitals          and          other          end-users.

> Our NDA [New Drug Application] for *Feraheme* was supported by four pivotal
> Phase III clinical studies for *Feraheme* as an IV iron replacement therapeutic
> agent in patients with CKD. These trials included patients with all stages of CKD,
> including patients with stages 1 through 5 CKD who were not on dialysis, patients
> with stage 5 CKD who were on hemodialysis or peritoneal dialysis, and kidney
> transplant recipients.

25.     The Prospectus also made positive statements regarding Feraheme's revenue

generation, stating in pertinent part as follows:

> On January 10, 2010, we announced expected *Feraheme* net product revenues of
> between $12.0 million and $13.0 million (unaudited) for the fourth quarter of
> 2009, including approximately $1.0 million of $11.5 million in previously
> deferred product revenues. During the third quarter of 2009, shortly after the
> launch of *Feraheme*, we implemented a launch incentive program, under which
> certain dialysis organizations purchased *Feraheme* directly from us. This
> incentive program provided these customers with discounted pricing and
> expanded rights of return and as a result we deferred revenues associated with this
> program which we will recognize as revenues as the participating organizations
> utilize their inventory of *Feraheme*. We expect that utilization of the remaining
> deferred product revenues from the launch incentive program, which were
> recorded during the third quarter of 2009, will increase going forward as each
> launch incentive program customer has now initiated a pilot program and begun
> to use *Feraheme*.

26.     The Prospectus purported to warn about the risk factors in purchasing the

Common Stock stating in pertinent part as follows:

> The degree of market acceptance of *Feraheme* depends on a number of factors,
> including but not limited to:
>
> * Our ability to demonstrate to the medical community, particularly nephrologists,
> hematologists, dialysis clinics and others who may purchase or prescribe
> *Feraheme*, the clinical efficacy and safety of *Feraheme* as an alternative to
> current treatments for iron deficiency anemia in both dialysis and non-dialysis
> chronic kidney disease patients;
>
> * The ability of physicians and other providers to be adequately reimbursed for
> *Feraheme* in a timely manner from payors, including government payors, such as
> Medicare and Medicaid, and private payors, particularly in light of the expected
> "bundling" of costs of providing care to dialysis patients;
>
> * The relative price of *Feraheme* as compared to alternative iron replacement
> therapeutic agents;
>
> * The actual or perceived convenience and ease of administration of *Feraheme* as
> compared to alternative iron replacement therapeutic agents;
>
> * The effectiveness of our sales and marketing organizations and our distribution
> network; and

**\* The development of unanticipated adverse reactions to *Feraheme* resulting in safety concerns among prescribers.** (emphasis added).

27.     The Prospectus further stated in pertinent part as follows:

**Significant safety or drug interaction problems could arise with respect to Feraheme even after FDA approval, resulting in recalls, restrictions in Feraheme's label, or withdrawal of Feraheme from the market.**

Discovery of previously unknown problems with an approved product may result in recalls, restrictions on the product's permissible uses, or withdrawal of the product from the market. The data submitted to the FDA as part of our new drug application was obtained in controlled clinical trials of limited duration. New safety or drug interaction issues may arise as *Feraheme* is used over longer periods of time by a wider group of patients taking numerous other medicines and with additional underlying health problems. In addition, as we conduct additional clinical trials for *Feraheme*, new safety problems may be identified which could negatively impact both our ability to successfully complete these studies and the use and/or regulatory status of *Feraheme* for the treatment of iron deficiency anemia in patients with chronic kidney disease. These new safety or drug interaction issues may require us to provide additional warnings on the *Feraheme* label, directly alert healthcare providers of new safety information, or narrow our approved indications, any of which could reduce the market acceptance of *Feraheme*. In addition, if significant safety or drug interaction issues arise, FDA approval for *Feraheme* could be withdrawn, and the FDA could require the recall of all existing *Feraheme* in the marketplace. The FDA also has the authority to require the recall of our products if there is contamination or other problems with manufacturing, transport or storage of the product. A government-mandated recall or a voluntary recall could divert managerial and financial resources, could be difficult and costly to correct, could result in the suspension of sales of *Feraheme*, and could have a severe adverse impact on our potential profitability and the future prospects of our business.

We may also be required to conduct certain post-approval clinical studies to assess known or suspected significant risks associated with *Feraheme*. The Food and Drug Administration Amendments Act of 2007 expanded the FDA's authority. Under the Food and Drug Administration Amendments Act, the FDA may: (i) require manufacturers to conduct post-approval clinical studies to assess known risks or signals of serious risks, or to identify unexpected serious risks; (ii) mandate labeling changes to a product based on new safety information; or (iii) require sponsors to implement a Risk Evaluation Management Strategy where necessary to assure safe use of the drug. If we are required to conduct post-approval clinical studies or implement a Risk Evaluation Management Strategy, or if the FDA changes the label for *Feraheme* to include additional discussion of

potential safety issues, such requirements or restrictions could have a material adverse impact on our ability to generate revenues from sales of *Feraheme,* or require us to expend significant additional funds on clinical studies.

**The Truth is Disclosed**

28.     On February 4, 2010, Carol Werther, a Summer Street analyst, downgraded AMAG from buy to neutral.  In a note to clients she wrote "We are aware of several patients hospitalized with anaphylactiod reactions to Feraheme. We are aware of one death that may or may not be directly related to Feraheme."

29.     The statements made in the Registration Statement and Prospectus were materially false or misleading because although they mentioned the risks of unknown drug safety issues, they failed to disclose the *existing fact* that Feraheme users had already suffered adverse reactions to Feraheme requiring hospitalization.

30.     On the disclosure of these facts, AMAG's shares fell by over $7.00, or more than 15% from $45.25 to $38.12.

31.     On February 8, 2010, following a February 5 conference call with management to discuss the safety questions surrounding Feraheme, Carol Werther issued a follow up report entitled "Feraheme Safety Update Raises more Questions than Answers."  In the report, Werther questioned management's calculated rate of the reported rate of serious adverse effects ("SAEs").

32.     On March 1, 2010, AMAG conducted a conference call to discuss 2009 fourth quarter results.  One question on the call, among others, came from Citigroup analyst Yaron Werber.  He asked, "there is obviously a big drop in sales from December to January.  So maybe you can help us understand what will be your thoughts on inventory and kind of what – how we should think of demand really growing from now on?"  Timothy Healy, Senior Vice President of AMAG, responded that sales in December were unusually high because of the structure of the

Company's provider discount program, and that provider purchasing activity increases during the last month of the quarter to qualify for certain rebates.

33.     In response to another question regarding the heightened sales in the month of December, Mr. Healy elaborated that sales in December were helped by the rebate structure, the implementation of Q-codes allowing easier reimbursement from insurance companies for Feraheme claims made by providers and the fact that December was a five week month – further increasing sales attributable to the month of December.

34.     Analyst Lu Gordon from Jeffries asked about the change in inventory levels from December 2009 to the first quarter of 2010. Mr. Healy declined to comment on inventory levels, other than to say that the Company was comfortable with them.

35.     During the conference call, management provided information which showed that in October demand was at approximately 2,200 grams of Feraheme and in November approximately 3,500 grams. However, in December the last reporting period prior to the Offering, demand skyrocketed to approximately 9,500 grams, followed by demand dropping to approximately 5,300 grams in January and an anticipated 6,500 grams in February and evidencing a dramatic front loading of sales through the Company's incentive program.

36.     In reaction to the disclosures in the conference call, AMAG's stock price once again declined, this time over 10% closing on March 1 at $34.17 per share down $4.02 from the previous day's closing price of $38.19.

37.     The statements made in the Registration Statement and Prospectus were materially false or misleading because they failed to disclose that the effect of the rebate program was to front load sales into the fourth quarter causing sales to drop off after the Offering was completed.

## CLAIM FOR RELIEF

### Against All Defendants for Violations
### Of Section 11 of the Securities Act

38.     Plaintiff repeats and realleges each and every allegation contained above.

39.     This Claim for Relief is brought pursuant to Section 11 of the Securities Act, 15

U.S.C. § 77k, on behalf of the Class, against all Defendants.

40.     The Registration Statement for the Offering was inaccurate and misleading,

contained untrue statements of material facts, omitted to state other facts necessary to make the

statements made not misleading, and concealed and failed adequately to disclose material facts

as described above.

41.     AMAG is the registrant for the Offering.  As issuer of the shares, AMAG is

strictly liable to plaintiff and the Class for the misstatements and omissions.

42.     The Defendants named herein were responsible for the contents and

dissemination of the Registration Statement and the Prospectus.  None of the Defendants named

herein made a reasonable investigation or possessed reasonable grounds for the belief that the

statements contained in the Registration Statement and the Prospectus were true and without

omissions of any material facts and were not misleading.

43.     Defendants issued, caused to be issued and participated in the issuance of

materially false and misleading written statements to the investing public that were contained in

the Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.

By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities

Act.

44.     Plaintiff acquired AMAG shares pursuant to, and in reliance on, the Registration

Statement.

12

45.     Plaintiff and the Class have sustained damages. The value of AMAG shares declined substantially subsequent to and due to Defendants' violations. At the times it purchased AMAG shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to January 21, 2010. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this Complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

(a)     Declaring this action to be a class action properly maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declaring Plaintiff to be a proper Class representative;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(d)     Awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED:  March 18, 2010                    **PYLE ROME EHRENBERG PC**


By _____
                              Betsy Ehrenberg (BBO #554628)
                              18 Tremont Street, Suite 500
                              Boston, MA 02108
                              617-367-7200
                              617-367-4820 (fax)
                              behrenberg@pylerome.com


Of counsel:

Jack G. Fruchter, Esq.
Jeffrey S. Abraham, Esq.
ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, New York 10119

14