**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |
|---|---|
| | ) |
| SILVERSTRAND INVESTMENTS, SAFRON | ) Civil Action No. 10-cv-10470-NMG |
| CAPITAL CORPORATION, and BRIARWOOD | ) |
| INVESTMENTS, INC., On Behalf of | ) |
| Themselves And All Others Similarly Situated, | ) |
| | ) **JURY TRIAL DEMANDED** |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| AMAG PHARMACEUTICALS, INC., BRIAN | ) |
| J.G. PEREIRA, DAVID A. ARKOWITZ, | ) |
| JOSEPH V. BONVENTRE, MICHAEL | ) |
| NARACHI, ROBERT J. PEREZ, LESLEY RUSSELL, | ) |
| M.D., DAVEY S. SCOON, RON ZWANZIGER, | ) |
| MORGAN STANLEY CO. INCORPORATED, J.P. | ) |
| MORGAN SECURITIES INC., GOLDMAN, SACHS | ) |
| CO., LEERINK SWANN LLC, ROBERT W. BAIRD | ) |
| CO. INCORPORATED, and CANACCORD | ) |
| GENUITY INC., | ) |
| | ) |
| Defendants. | ) |

_____)

**SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ............................................................1

II.     JURISDICTION AND VENUE ..................................................................................6

III.    PARTIES ...............................................................................................................7

        A.      Plaintiffs ...................................................................................................7

        B.      Defendants ...............................................................................................8

IV.     CLASS ACTION ALLEGATIONS ...........................................................................11

V.      FACTUAL ALLEGATIONS ....................................................................................13

        A.      Numerous Serious Adverse Events and Deaths Are Associated with
                Feraheme Use...........................................................................................13

                1.      AMAG's New Drug Application for Feraheme Was Twice
                        Rejected by the FDA, Citing the Occurrence of Serious
                        Adverse Events During Clinical Trials ......................................13

                2.      Information Obtained Through a FOIA Request to the FDA
                        Confirms the Occurrence of at Least 11 Deaths and Dozens of
                        Documented Cases of Anaphylaxis Since Feraheme's Launch
                        in July 2009...............................................................................16

                3.      Defendants Received Numerous Reports of Serious Adverse Events
                        Resulting from Feraheme Use Prior to the Offering..................16

        B.      The FDA Requires AMAG to Change Feraheme's Labeling to Include
                Stricter Warnings Concerning, *Inter Alia*, the True Incidence of SAEs................19

        C.      During the Relevant Time Period, AMAG Violated Federal Law and FDA
                Regulations by Making Materially Misleading Statements on its Website
                Concerning the Risks and Approved Use for Feraheme...................... 21

VI.     THE FALSE AND MISLEADING STATEMENTS IN THE REGISTRATION
        STATEMENT AND PROSPECTUS ...............................................................23

VII.    THE TRUE SAFETY PROFILE AND COMMERCIAL VIABILITY OF FERAHEME IS REVEALED, CAUSING A 71% DECLINE IN AMAG'S STOCK PRICE ...................................................................................................................33

    A.    News of the SAEs Begins to Leak Out..................................................................33

    B.    The FDA Mandates Stricter Warnings Concerning SAEs on Feraheme's Label ...................................................................................................................38

    C.    Feraheme Sales Plummet As Health Care Providers Become Aware of the Safety Issues Related To Feraheme Use...............................................................45

VIII.    CAUSES OF ACTION ......................................................................................46

COUNT I ...........................................................................................................................46

COUNT II ..........................................................................................................................48

COUNT III .........................................................................................................................50

IX.    PRAYER FOR RELIEF .....................................................................................52

X.    JURY TRIAL DEMANDED ...............................................................................52

Lead Plaintiff, as defined in paragraph 1 below ("Lead Plaintiff") hereby brings this second amended class action complaint against AMAG Pharmaceuticals, Inc. ("AMAG" or "the Company"), the Individual Defendants (as defined herein) and the Underwriter Defendants (as defined herein, and collectively with AMAG and the Individual Defendants, the "Defendants"). The allegations against Defendants are based on personal knowledge as to Lead Plaintiff's own acts and on information and belief as to all other matters, with such information and belief having been informed by the investigation conducted by and under the supervision of their counsel ("Lead Counsel") which included, among other things: (i) review and analysis of AMAG's public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, conference presentations, earnings call transcripts, and other public statements issued by the Company; (ii) review and analysis of records of the Food and Drug Administration ("FDA") and other documents concerning, among other things, the clinical trials and approval process for Feraheme, the post-marketing safety issues associated with Feraheme, and the FDA Warning Letter issued to the Company on October 18, 2010 (the "FDA Warning Letter"); (iii) securities analysts' reports and advisories about the Company; and (iv) interviews with former employees and other persons with knowledge of the matters alleged herein, some of whom have provided information in confidence (these confidential witnesses ("CWs") will be identified herein by number (e.g., CW1, CW2)).  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.     Court-appointed Lead Plaintiffs Silverstrand Investments, Safron Capital Corporation and Briarwood Investments, Inc. (collectively, "Lead Plaintiff") bring this federal

securities class action on behalf of all purchasers of common stock of AMAG ("Common

Stock") pursuant or traceable to the Company's Registration Statement filed with the SEC, No.

333-164400, dated January 19, 2010 (the "Registration Statement") and accompanying

Prospectus (the "Prospectus," together with the Registration Statement and all documents

incorporated by reference therein, the "Offering Documents") issued in connection with the

secondary offering conducted on or about January 21, 2010 (the "Offering").  Lead Plaintiff

seeks remedies under the Securities Act of 1933 (the "Securities Act").

2.     AMAG is a biopharmaceutical company engaged in the development and

commercialization of two drugs, Feraheme® (ferumoxytol injection) (herein "Feraheme"), a

powerful intravenous iron-replacement drug that rapidly administers a high quantity of iron

directly into the bloodstream, and GastroMARK® (herein "GastroMARK"), an oral contrast

agent used for delineating the bowel in magnetic resonance imaging (MRI).

3.     Feraheme is indicated for the treatment of iron deficiency anemia ("IDA") in

adult patients with chronic kidney disease ("CKD").  This action arises from material

misrepresentations and omissions in the Offering Documents concerning the safety profile and

commercial viability of Feraheme.

4.     AMAG is dependent on the commercial success of Feraheme.  As stated in

pertinent part in the Prospectus:

> ***Our ability to generate future revenues is solely dependent on our successful***
> ***commercialization and development of Feraheme.  We currently sell only one***
> ***other product, GastroMARK, in the U.S. and in certain foreign jurisdictions***
> ***through our partners.*** However, sales of Ga*stroMARK* have been at their current
> levels for the last several years, and we do not expect sales of *GastroMARK* to
> materially increase.   ***Accordingly, if we are unable to generate sufficient***
> ***revenues from sales of Feraheme, we may never be profitable, our financial***
> ***condition will be materially adversely affected, and our business prospects will***
> ***be limited.*** (Emphasis added.)

5.      Prior to the Offering, the FDA twice denied AMAG's application for approval of Feraheme, citing serious concern about (i) the occurrence of a single reported case of anaphylaxis during clinical trials; (ii) accusing the Company of underreporting and/or minimizing the occurrence of serious adverse events ("SAEs"); and (iii) finding systemic defects in the Company's manufacturing processes.  Following numerous amendments to its application, Feraheme was finally approved for sale by the FDA on June 30, 2009.

6.      Within months of Feraheme's launch, and prior to the Offering, AMAG had already received dozens of reports of SAEs, including anaphylactic and cardiac related reactions, which resulted in hospitalizations and at least one report of a death associated with a Feraheme injection.  Indeed, one former AMAG sales representative ("CW1") affirmed that all five sales representatives in his territory alone were receiving frequent reports of SAEs, with some physicians reporting multiple SAE cases among their patients.  Further, the SAEs occurred across a broad spectrum of patients, ranging in ages from 32 to 96 with varied medical conditions.

7.      In total, since its launch in July 2009, Feraheme has been linked to at least 146 SAEs, including 11 fatalities and 14 cases of anaphylaxis. Eight of the eleven deaths were preceded by cardiac related SAE's, and six of the deaths were the result of cardiac arrest.

8.      On January 21, 2010, the Company completed the Offering, selling 3,600,000 shares of its Common Stock for a price of $48.25 per share, resulting in net proceeds to the Company of approximately $165.6 million.

9.      The Offering Documents failed to disclose the occurrence of any SAEs, let alone anaphylactic reactions, cardiac events, or any fatalities; or that SAEs were occurring at a

significant rate.  As a result of Defendants' misstatements and omissions of material fact,

investors were unaware of the true safety profile and commercial viability of Feraheme.

10.     Two weeks after the Offering, on February 4, 2010, an analyst with Summer

Street Capital Partners ("Summer Street") revealed for the first time that there were "several

patients hospitalized with anaphylactoid reactions to Feraheme . . . [and] one death that may or

may not be directly related to Feraheme."

11.     Following the February 4th Summer Street report, AMAG's stock plunged by over

$7.00, or more than 15% from $45.25 per share to close at $38.12 per share, damaging Lead

Plaintiff and the Class, who purchased the Common Stock pursuant or traceable to the Offering.

12.     The next day, on February 5, 2010, the Company issued a press release and held a

conference call, in which it provided a "safety update" concerning Feraheme.  The Company

disclosed that it had received reports of forty (40) SAEs since the drug's launch, or an

approximate rate of .1% per "patient exposure."  However, the Company understated the SAEs

that had occurred because it failed to calculate the rate *per patient* (the metric used during

clinical trials) and instead used the different, more generous, *per patient exposure* metric.

13.     On the following Monday, February 8, 2010, Summer Street issued another report

in response to the Company's press release and conference call, recognizing that the metric used

by AMAG in calculating SAEs post-marketing "is not a valid comparison" with the reported rate

during clinical trials, and noting that the number of SAEs were likely higher than forty (40)

because of reporting time lags and the recency of the events.  The February 8th Summer Street

report further observed that Feraheme's primary competitor, Venofer®, has been associated with

only one SAE and one death in the ten years that Venofer® has been on the market, according to

Summer Street's conversations with clinicians.

14.     Following the February 8th Summer Street report, the price of AMAG's stock fell once again to close at $36.67 per share, making for a decline of 19% in the value of the shares sold in the Offering.

15.     Within months of the Offering, the FDA took action in response to the pattern of SAEs reported to AMAG, including the fatalities associated with Feraheme use, as set forth herein.  In August 2010, the FDA created a "Tracked Safety Issue" (hereinafter sometimes referred to as "TSI") for Feraheme, and subsequently required AMAG to change Feraheme's label to include additional bolded warnings and precautions regarding SAEs caused by anaphylactic and cardiac related events, as well as an increase in the observation period for patients following a Feraheme injection.

16.     The Offering Documents were materially false and misleading when made because they failed to disclose the true safety profile and commercial viability of Feraheme. Specifically, the Offering Documents failed to disclose that a significant number of reports of SAEs were made to the Company prior to the issuance of the Offering Documents, including at least one reported death that was suspected to have been caused by Feraheme and several incidents of anaphylaxis, including cardiac-related events, resulting in hospitalization.  The occurrence and severity of these SAEs, particularly in light of the FDA's stated concerns in approving Feraheme, were material to the commercial viability of Feraheme and thus the ability of AMAG to generate future revenues.  In particular, these events could have, and did, trigger adverse action by the FDA in the form of stricter labeling warnings, and were likely to impact physicians' use of Feraheme as an alternative to competing treatments for iron deficiency in both dialysis and non-dialysis CKD patients.

17.     On October 18, 2010, the FDA issued a Warning Letter to AMAG finding that the Company had, *inter alia*, misbranded Feraheme in violation of the Food, Drug and Cosmetic Act, 21 U.S.C. 352(a), (f)(1) & (n); 321(n), and FDA's implementing regulations by making materially misleading statements on the Company's website concerning the safety and approved use of Feraheme.  The Warning Letter also stated that AMAG had failed to submit its labeling and advertising statements promoting GastroMARK and Feraheme on its website to the FDA as required by 21 C.F.R. §314.81(b)(3)(1).

18.     The Offering Documents failed to disclose that a material portion of the Company's revenues were derived from the illegal and materially misleading marketing practices identified by the FDA in the Warning Letter, in that the Company's website made certain representations concerning Feraheme's safety and use approved by the FDA but failed to disclose risks associated with Feraheme use and included representations concerning unapproved uses.

19.     The Offering Documents also failed to disclose that AMAG had not complied with 21 C.F.R. §314.81(b)(3)(1) in submitting the requisite documentation to the FDA regarding labeling and advertising statements promoting GastroMARK and Feraheme.

20.     As a result of the disclosure of the pattern, frequency and severity of SAEs reported to the Company and the Company's misleading and illegal marketing practices and failure to comply with applicable FDA regulations as set forth herein, the price of AMAG's stock has fallen more than 71% from the Offering price.

## II.    JURISDICTION AND VENUE

21.     The claims asserted herein arise under and are brought pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), 77o.

22.     This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

23.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.  At all relevant times, AMAG maintained its headquarters and principal place of business in this District.  Many of the acts and conduct complained of herein occurred in this District, including the dissemination to the investing public of the materially false and misleading statements in the Offering Documents.

24.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## III.    PARTIES

### A.     Plaintiffs

25.     Plaintiff Silverstrand Investments purchased AMAG Common Stock, as set forth in the certification previously submitted to the Court and incorporated herein by reference, pursuant to the Offering, and was damaged thereby.

26.     Plaintiff Safron Capital Corporation purchased AMAG Common Stock, as set forth in the certification previously submitted to the Court and incorporated herein by reference, pursuant to the Offering, and was damaged thereby.

27.     Plaintiff Briarwood Investments, Inc. purchased AMAG Common Stock, as set forth in the certification previously submitted to the Court and incorporated herein by reference, pursuant to the Offering, and was damaged thereby.

**B.     Defendants**

*AMAG*

28.     Defendant AMAG is a biopharmaceutical company formed under Delaware law and maintains its principal executive offices at 100 Hayden Avenue, Lexington, Massachusetts 02421.

*Individual Defendants*

29.     Defendant Dr. Brian J. G. Pereira ("Pereira") was, at all relevant times, President, Chief Executive Officer and Executive Director of AMAG.  Pereira signed the Registration Statement and solicited the purchase of AMAG's registered Common Stock by the use of means or instruments of transport or communication in interstate commerce or of the mails and by means of the Prospectus and other oral and written communications, including road shows.

30.      Defendant David A. Arkowitz ("Arkowitz") was, at all relevant times, Executive Vice President and Chief Financial Officer of AMAG.  Arkowitz signed the Registration Statement and solicited the purchase of AMAG's registered Common Stock by the use of means or instruments of transport or communication in interstate commerce or of the mails and by means of the Prospectus and other oral and written communications, including road shows.

31.     Defendant Joseph V. Bonventre, M.D. ("Bonventre") was, at all relevant times, a Director of AMAG.  Bonventre signed the Registration Statement.

32.     Defendant Michael Narachi ("Narachi") was, at all relevant times, a Director of AMAG.  Narachi signed the Registration Statement.

33.     Defendant Robert J. Perez ("Perez") was, at all relevant times, a Director of AMAG.  Perez signed the Registration Statement.

34.     Defendant Lesley Russell, M.D. ("Russell") was, at all relevant times, a Director of AMAG.  Russell signed the Registration Statement.

35.     Defendant Davey S. Scoon ("Scoon") was, at all relevant times, a Director of AMAG.  Scoon signed the Registration Statement.

36.     Defendant Ron Zwanziger ("Zwanziger") was, at all relevant times, a Director of AMAG.  Zwanziger signed the Registration Statement.

37.     Defendants Pereira, Arkowitz, Bonventre, Narachi, Perez, Russell, Scoon and Zwanziger are referred to herein as the "Individual Defendants."

*Underwriter Defendants*

38.     Each of the Defendants listed in paragraphs 40 through 45, collectively referred to as the "Underwriter Defendants," provided underwriting services to AMAG for the Offering. The Underwriter Defendants collectively received $7.8 million in underwriting fees for services provided in the Offering.

39.     As underwriters, the Underwriter Defendants, collectively and individually, are liable for material omissions and misstatements contained in the Offering Documents unless they can prove that they conducted, prior to the Offering, a reasonable investigation of the Company to ensure that the statements contained in such documents contained no material misstatements or omissions of material fact.  The Underwriter Defendants failed to fulfill their duty to the investing public in this regard and cannot bear their burden to show an adequate investigation under the circumstances.

40.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is an investment bank with offices in Boston, Massachusetts.  Morgan Stanley was a Lead Manager for the Offering.  Pursuant to the Offering, Morgan Stanley sold and distributed 1,980,000 shares

of AMAG Common Stock.  Morgan Stanley was paid over $4.2 million for its underwriting

services in connection with the Offering.

41.     Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") is an investment bank

with offices in Boston, Massachusetts.  J.P. Morgan was a Lead Manager for the Offering.

Pursuant to the Offering, J.P. Morgan sold and distributed 720,000 shares of AMAG Common

Stock.  J.P. Morgan was paid over $1.5 million for its underwriting services in connection with

the Offering.

42.     Defendant Goldman, Sachs & Co., Inc. ("Goldman Sachs") is an investment bank

with offices in Boston, Massachusetts.  Goldman Sachs was a Lead Manager for the Offering.

Pursuant to the Offering, Goldman Sachs sold and distributed 540,000 shares of AMAG

Common Stock. Goldman Sachs was paid over $1.1 million for its underwriting services in

connection with the Offering.

43.     Defendant Leerink Swann LLC  ("Leerink Swann") is an investment bank with

offices in Boston, Massachusetts.  Leerink Swann was a Co-Manager for the Offering.  Pursuant

to the Offering, Leerink Swann sold and distributed 180,000 shares of AMAG Common Stock.

Leerink Swann was paid over $390,000 for its underwriting services in connection with the

Offering.

44.     Defendant Robert W. Baird Co. Incorporated ("Robert Baird") is an

investment bank with offices in Boston, Massachusetts.  Robert Baird was a Co-Manager for the

Offering.  Pursuant to the Offering, Robert Baird sold and distributed 90,000 shares of AMAG

Common Stock.  Robert Baird was paid over $195,000 for its underwriting services in

connection with the Offering.

45.     Defendant Canaccord Genuity Inc. ("Canaccord Genuity"), formerly known as Canaccord Adams Inc., is an investment bank with offices in Boston, Massachusetts.  Canaccord Genuity was a Co-Manager for the Offering.  Pursuant to the Offering, Canaccord Genuity sold and distributed 90,000 shares of AMAG Common Stock.  Canaccord Genuity was paid over $195,000 for its underwriting services in connection with the Offering.

## IV.   CLASS ACTION ALLEGATIONS

46.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons who purchased the Common Stock of AMAG pursuant to or traceable to the Offering.  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  AMAG sold 3.6 million shares in the Offering.  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of AMAG or its transfer agent or the underwriters to the Offering.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any question affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     Whether the Prospectus and Registration Statement (as defined herein) issued by Defendants to the investing public in connection with the Offering misrepresented or omitted to state material facts about AMAG and its business; and

(c)     The extent of injuries sustained by members of the Class and the appropriate measure of damages.

49.     Lead Plaintiff's claims are typical of the claims of the other members of the Class because Lead Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

50.     The Court-appointed Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

51.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of

no difficulty that will be encountered in the management of this litigation that would preclude its

maintenance as a class action.

## V.      FACTUAL ALLEGATIONS

52.      Since it was founded in 1981, AMAG has marketed three drug products:

Feridex I.V.® ("Feridex I.V."), GastroMARK and Feraheme.  Feridex I.V., a liver contrast

agent, was approved by the FDA in 1996.  In November 2008, AMAG decided to cease

manufacturing Feridex I.V. and subsequently terminated all of its licensing agreements for the

drug.

53.      GastroMARK, an oral contrast agent used for delineating the bowel in MRI, was

approved by the FDA in 1996.  GastroMARK is indicated in adult patients for oral use with MRI

to enhance the delineation of the bowel to distinguish it from organs and tissues that are adjacent

to the upper regions of the gastrointestinal tract.

54.      Prior to the Offering, GastroMARK sales were the primary source of the

Company's revenue.  For example, as disclosed in AMAG's Form 10-K for the fiscal year ended

December 31, 2008 incorporated by reference in the Offering Documents, in 2008, sales of

GastroMARK constituted approximately 60% of AMAG's total revenues.

### A.      Numerous Serious Adverse Events and Deaths Are Associated with Feraheme Use

#### 1.      AMAG's New Drug Application for Feraheme Was Twice Rejected by the FDA, Citing the Occurrence of Serious Adverse Events During Clinical Trials

55.      On December 18, 2007, AMAG submitted a new drug application ("NDA") to the

FDA seeking approval for the marketing of Feraheme in the United States for the treatment of

iron deficiency anemia in patients with CKD.

56.     At the time AMAG submitted its NDA for Feraheme, there were two competing

intravenous iron-replacement therapeutic agents, Venofer® and Ferrlecit®, already approved by

the FDA for the same indicated use sought by AMAG.  Unlike Feraheme, however, these drugs

are not bolus, or rapid-injection, intravenous agents; rather, they are administered as a "slow

push" or a 15 to 60-minute intravenous infusion at much lower dosages of 100 to 200

milligrams, and require five to ten physician visits for a complete course of treatment.  By

contrast, Feraheme is administered in bolus injections of 510 milligrams each, which take

approximately 17 seconds to administer and can be accomplished in between two and four

physician visits.  According to the U.S. package insert, the recommended Feraheme dose (2 x

510 mg) may be re-administered to patients with persistent or recurrent iron deficiency anemia.

57.     Notwithstanding the Company's submission of twenty (20) amendments to its

Feraheme NDA, dated February 27, April 3, 14 and 28, May 20, June 5 and 23, July 16 and 24,

August 4, 5 and 7, September 3(2), 5, 22, 23, and 25, October 1 and 3, 2008, the FDA declined

to approve Feraheme, citing the occurrence of a "clinical pattern of serious adverse reactions" as

well as several other safety concerns that had arisen during the clinical trials of Feraheme.

58.     In particular, in an action letter sent to AMAG dated October 17, 2008, the FDA

stated that it was *declining to approve Feraheme* due, in part, to a single occurrence of

anaphylaxis among the 1,726 patients exposed to Feraheme.  Anaphylaxis is a life-threatening

whole-body allergic reaction to a drug or allergen. (For example, anaphylaxis may result from a

severe allergy to bee venom or peanuts.)  Within seconds or minutes of exposure to the drug or

allergen, the immune system releases a flood of chemicals that can cause the body to go into

shock, and causes, among other things, a sudden drop in blood pressure (hypotension) and a

narrowing of airways that blocks normal breathing.  Signs and symptoms of anaphylaxis include

a rapid, weak pulse, hives, dizziness, syncope (loss of consciousness), fever, vomiting and nausea. The onset of anaphylaxis is rapid, and must be treated immediately, typically in a hospital emergency room, by an injection of epinephrine.  If left untreated, anaphylaxis can result in death.

59.     In addition to the single anaphylaxis event, the FDA stated that it was concerned by the occurrence of "serious hypotensive reactions" in approximately 0.3% of the exposed population.

60.     The FDA further determined that AMAG had underreported and/or minimized the occurrence of SAEs as set forth in the FDA's October 17, 2008 letter to AMAG:

> ***The inspectors determined that adverse events, including serious adverse events, were not consistently reported.*** To illustrate, subject 554 appears to have experienced a serious hypotensive event that prompted the delay of a second dose of ferumoxytol.  The adverse event report denoted this event as a "headache" and did not describe the other clinical problems. Additionally, ***drug disposition records were inaccurate*** for four subjects and our inspectional team recommended elimination of the clinical data from these four subjects, with respect to assessment of ferumoxytol safety and efficacy.
>
> The FDA also cited deficiencies discovered during a field inspection of AMAG's manufacturing facility for Feraheme, located in Cambridge, Massachusetts, as a reason for declining to approve Feraheme. (Emphases added.)

61.     In response to the FDA's action letter dated October 17, 2008, AMAG sent the FDA an amended NDA dated October 30, 2008, seeking to address the safety issues raised by the FDA.  Following its review of the October 30, 2008 amendment, the FDA again declined to approve the application for approval of Feraheme.

62.     Following another round of amendments to its NDA, Feraheme was finally approved by the FDA on June 30, 2009.  In July 2009, the Company launched the drug for sale in the U.S. market.

63.     Despite the FDA approval of Feraheme, the safety and risk issues identified during the clinical trials increased in number and severity after Feraheme was approved. Following its approval in July 2009 and prior to the Offering, both the Company and the FDA received dozens of reports of SAEs related to Feraheme use, including several cases of anaphylaxis, cardiac-related events, and at least one death.

> **2.     Information Obtained Through a FOIA Request to the FDA Confirms the Occurrence of at Least 11 Deaths and Dozens of Documented Cases of Anaphylaxis Since Feraheme's Launch in July 2009**

64.     On December 31, 2009, prior to the Offering, AMAG reported to the FDA the death of a 70-year-old female following one 510 mg injection of Feraheme.  Feraheme was identified as the "Primary Suspect" in the fatality.  Defendants did not disclose the occurrence of this fatality in the Offering Documents.

65.     The fatality reported to the FDA was not publicly available information at the time of the Offering.  Lead Counsel obtained this information through a recent request to the FDA pursuant to the FOIA.

66.     Moreover, information obtained through Lead Counsel's FOIA request to the FDA reveal that AMAG has reported at least ***ten additional deaths*** associated with Feraheme use since the Offering was conducted.  ***Defendants did not disclose any of the fatalities associated with Feraheme use until October 2010, nine months after the Offering.***

> **3.     Defendants Received Numerous Reports of Serious Adverse Events Resulting from Feraheme Use Prior to the Offering**

67.     From the time of Feraheme's launch in July 2009 through January 21, 2010, the date the Offering was conducted, AMAG's customers, who include physicians, hematology clinics, dialysis centers and hospitals, were routinely reporting SAEs directly to AMAG sales representatives.  Sales representatives then forwarded the reports to an internal "Medical Affairs"

department, known and referred to as "Safety" among AMAG sales representatives.  Indeed,

sales representatives were required to forward all reported SAEs that they received from "the

field" to the Medical Affairs department.  The Medical Affairs department was responsible for

following up on reported SAEs with the reporting person or entity.

68.     CW1, a former sales representative who was employed by AMAG from March

2009 to May 2010, recalls that following Feraheme's launch in July 2009, all five sales

representatives in his territory began receiving reports of SAEs on a routine basis.  CW1 further

states that some physicians were even reporting multiple cases of SAEs.  CW1 recalls that he

received at least one report involving a case of anaphylaxis, reported to him directly by a

physician in December 2009.  As required by the Company, CW1 forwarded the report to the

Medical Affairs department.

69.     CW2, another former sales representative who was employed by AMAG from

September 2008 to April 2010, confirmed that she received reports of at least five (5) SAEs from

physicians including two in January 2010 prior to the Offering.

70.     Both CW1 and CW2 forwarded the reported SAEs they received to the Medical

Affairs department at AMAG for follow-up investigation and routinely discussed the reports

with certain senior managers.

71.     As of the date of the Offering, AMAG reported to the FDA (but failed to disclose

to investors) twenty-three (23) SAEs associated with Feraheme use, including documented

anaphylactic reactions in two female patients, ages 38 and 51, with a "life-threatening" outcome

requiring hospitalization, as reported on October 18, 2009 and November 12, 2009 respectively.

In fact, at least sixteen (16) of those twenty-three (23) SAEs exhibited one or more symptoms

associated with anaphylaxis, such as cardiac arrest, shortness of breath, a reduction in blood

17

pressure (hypotension), loss of consciousness, hives, dizziness, or vomiting, and resulted in

hospitalization; yet, the Company did not report them to the FDA as anaphylactic reactions.

72.     By February 5, 2010 – just two weeks after the Offering – the number of reported

SAEs had mysteriously increased by over 73.9%, from twenty-three (23) to forty (40), according

to the Company's February 5, 2010 press release (described below).  Among these were several

more documented cases of anaphylaxis, along with numerous cases that presented multiple

anaphylactic symptoms.

73.     None of the above-referenced reported SAEs were publicly available information

at the time of the Offering.

74.     Coupled with the fatality, the reporting of at least twenty-three (23) SAEs,

including at least two documented anaphylactic reactions and several cardiac-related events, all

of which occurred within only a few months of Feraheme's launch and exposure to a relatively

low patient population, established a clear and significant pattern of SAEs by the time the

Offering was conducted.  These events constituted material information that was likely to, and

ultimately did affect, the safety profile and commercial viability of Feraheme, and should have

been disclosed to investors.  Specifically, the events could have, and did, trigger FDA action, in

the form of stricter labeling warnings for Feraheme, and otherwise impact physicians' use of the

drug, thereby affecting the commercial viability of Feraheme and thus future revenues of

AMAG.

75.     In total, at least one hundred forty-six (146) SAEs, including at least eleven (11)

deaths, associated with Feraheme use have been reported through October 2010, a number that

has grown in significance both in frequency and severity.  Moreover, it is widely understood in

the health care industry that the actual incidence of SAEs is likely much higher than reported,

since reporting to manufacturers and the FDA by physicians and consumers is strictly voluntary,

resulting in incomplete or delayed reports, or avoidance of submitting reports because of the

lengthy forms that must be filled out.

**B.      The FDA Requires AMAG to Change Feraheme's Labeling to Include Stricter Warnings Concerning, *Inter Alia*, the True Incidence of SAEs**

76.      On October 28, 2010, AMAG held an earnings call to discuss its third quarter

results.  During the call, the Company announced for the first time that (1) the FDA had created a

Tracked Safety Issue for cardiac-related SAEs relating to Feraheme use in late August 2010; (2)

the FDA had met with the Company in September to discuss the SAEs, and (3) the Company

was "in discussions with the FDA concerning labeling changes."  Prior to the Company's

announcement, such information was not available to the public.

77.      In its Form 10-Q for the period ended September 30, 2010, filed on November 8,

2010, AMAG reported:

> At our request, we met with the FDA in September 2010 regarding the FDA's creation of a Tracked Safety Issue for Feraheme in the FDA's Document Archiving, Reporting and Regulatory Tracking System related to potential safety signals of cardiac disorders in patients receiving Feraheme. Of the estimated more than 155,000 patient exposures through October 4, 2010 in the post-marketing environment, 146 cases of serious adverse events have been reported, an estimated reporting rate of less than 0.1%. The per patient serious adverse event rate contained in the U.S. package insert is 0.2%. We believe that the estimated reporting rate of serious adverse events by exposure in the post-marketing environment is consistent with the per patient serious adverse event rate contained in the U.S. package insert. ***However, life-threatening and fatal events, including hypersensitivity and cardiac events, have been reported after Feraheme administration in the post-marketing environment. We are currently in discussions with the FDA regarding potential changes to the Feraheme package insert. Specific changes being discussed include, a boxed warning to highlight the risks observed in the post-marketing environment and an extension of the observation period following Feraheme administration. Depending on the outcome of our discussions with the FDA, the potential changes to the Feraheme package insert could have an adverse impact on future sales of Feraheme.*** (Emphasis added.)

78.     In the Form 10-Q for the period ended September 30, 2010, the Company discussed the potential impact of stricter labeling requirements by the FDA and their potential impact on the commercial viability of Feraheme:

Risk Factors

*The following is a summary description of some of the material risks and uncertainties that may affect our business, including our future financial and operational results. In addition to the other information in this Quarterly Report on Form 10-Q, the following statements should be carefully considered in evaluating us.*

For example, the FDA recently created a Tracked Safety Issue for *Feraheme* in its Document Archiving, Reporting and Regulatory Tracking System related to potential safety signals of cardiac disorders in patients receiving *Feraheme*. We are currently in discussions with the FDA regarding potential changes to the *Feraheme* package insert which may include, among other things, a boxed warning to highlight risks observed in the post-marketing environment and an extension of the observation period following *Feraheme* administration. Depending on the exact nature of the changes to the *Feraheme* package insert, our ability to successfully compete in the IV iron market and potential sales of *Feraheme* may be adversely impacted. ***For example, if our discussions with the FDA result in a boxed warning in the Feraheme package insert, a recall or withdrawal of Feraheme from the market, or a requirement that we implement a REMS program, potential sales of Feraheme and our future business prospects could be significantly adversely impacted.*** (Emphasis added.)

79.     On November 29, 2010, the FDA announced the imposition of the new warnings and precautions to be added to Feraheme's labeling regarding the drug's safety profile as well as a mandatory increase in the observation period for patients following Feraheme administration. In particular, the FDA required AMAG to include:

(1)     Bolded warnings and precautions that describe events that have been reported after Feraheme administration in the post-marketing environment, including life-threatening hypersensitivity reactions and clinically significant hypotension, as follows:

## WARNINGS AND PRECAUTIONS

### Hypersensitivity Reactions

▪ Feraheme may cause serious life-threatening hypersensitivity reactions including anaphylaxis and/or anaphylactoid reactions. Anaphylactic type reactions presenting with cardiac/ cardiorespiratory arrest, clinically significant hypotension, syncope, and unresponsiveness have been reported in the post-marketing experience.

### Hypotension

▪ Severe adverse reactions of clinically significant hypotension have been reported.

(2)     A new section of the label entitled Adverse Reactions from Post-marketing

Spontaneous Reports, as follows:

## ADVERSE REACTIONS

### Postmarketing Experience

...The following serious adverse reactions have been reported from the post-marketing

spontaneous reports with Feraheme: life-threatening anaphylactic/anaphylactoid

reactions, cardiac/cardiorespiratory arrest, clinically significant hypotension, syncope,

unresponsiveness, loss of consciousness, tachycardia/rhythm abnormalities,

angioedema, ischemic myocardial events, congestive heart failure, pulse absent, and

cyanosis....

(3)     and, an increase in the observation period following Feraheme administration

from 30 to 60 minutes to observe patients for signs and symptoms of hypersensitivity.

**C.     During the Relevant Time Period, AMAG Violated Federal Law and FDA Regulations by Making Materially Misleading Statements on its Website Concerning the Risks and Approved Use for Feraheme**

80.     On October 18, 2010, the FDA issued a Warning Letter to AMAG concerning

material misrepresentations and omissions on AMAG's website regarding both GastroMARK

and Feraheme and specifically, *inter alia*, (1) the risks associated with Feraheme use; (2)

unapproved uses for Feraheme.

81.     Specifically, the FDA Warning Letter stated that:

**The webpages [for GastroMARK and Feraheme] present numerous efficacy claims for GastroMARK and Feraheme, but fail to communicate any of the risks associated with the drugs** (see Background section above).  By omitting the most serious and frequently occurring risks associated with these drugs, **the webpages misleadingly suggest that GastroMARK and Feraheme are safer than has been demonstrated and therefore place the public at risk**.  For example, the GastroMARK webpage omits the drug contraindication in patients with known or suspected intestinal perforation or obstruction. We note that there are links to "Download the GastroMARK® Package Insert" at the bottom of the GastroMARK webpage and to "Download the Feraheme Package Insert" buried in the second sentence of the Feraheme webpage. However, these links do not mitigate the complete omission of risk information from the GastroMARK and Feraheme webpages . . . .

**Promotion of Unapproved Uses**

The Feraheme webpage includes the following claims:

- "Feraheme is indicated for the treatment of iron deficiency anemia in adult patients with chronic kidney disease."

- "Feraheme is being developed to treat iron deficiency anemia associated with other conditions and disease states including women with abnormal uterine bleeding, and patients with cancer and gastrointestinal diseases."

- "Feraheme is also being developed as a diagnostic agent for vascular-enhanced magnetic resonance imaging to enhance peripheral arterial disease . . . ."

**The presentation of both approved and unapproved product information for Feraheme together in this manner is misleading because it implies that Feraheme is effective for unapproved uses.** However, Feraheme is not approved to treat iron deficiency anemia in women with abnormal uterine bleeding, or in patients with cancer and gastrointestinal diseases.  In addition, Feraheme is not approved as a diagnostic agent for vascular-enhanced magnetic resonance imaging for the detection of clinically significant arterial stenosis or occlusion in subjects with peripheral arterial disease . . . .

**The above statements thus misbrand Feraheme . . . . (Emphases added).**

82.     As a result of the material misstatements and omissions described in the preceding paragraph, the FDA found that AMAG had misbranded Feraheme in violation of the Food, Drug, And Cosmetic Act, 21 U.S.C. §§ 352(a),(f)(1) & (n), and FDA's implementing regulations, 21 C.F.R. §§ 201.100(c)(1), 201.128, 202.1(e)(3)(i), (e)(5) & (e)(6)(i).

83.     The FDA Warning Letter also charged AMAG with violating 21 C.F.R. § 314.81(b)(3)(i) in failing to submit copies of the Feraheme and GastroMARK webpages on Form FDA-2253 to the FDA, which AMAG was required to do at the time of initial dissemination of the labeling and/or at the time of initial publication of the advertisement for Feraheme and GastroMARK.

## VI.   THE FALSE AND MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT AND PROSPECTUS

84.     On or about January 19, 2010, AMAG filed with the SEC a Form S-3/ASR, the Registration Statement for the Offering, using a "shelf" registration process.  The Registration Statement became effective upon filing.  Pursuant to the Registration Statement as amended by the accompanying Prospectus, dated January 21, 2010, AMAG sold 3,600,000 shares of Common Stock at a price of $48.25 per share for total offering proceeds of $173,700,000. AMAG granted the underwriters a right to purchase up to an additional 540,000 shares to cover potential over-allotments.

85.     The Registration Statement and Prospectus incorporated by reference therein the following materially misleading AMAG public filings:

- AMAG's Form 10-K for the fiscal year ended December 31, 2008;

- AMAG's Form 10-Q for the fiscal quarter ended March 31, 2009;

- AMAG's Form 10-Q for the fiscal quarter ended June 30, 2009;

- AMAG's Form 10-Q for the fiscal quarter ended September 30, 2009;

- AMAG's Form 8-K filed with the SEC on December 22, 2009;

- AMAG's Form 8-K filed with the SEC on December 17, 2009;

- AMAG's Form 8-K filed with the SEC on October 8, 2009;

- AMAG's Form 8-K filed with the SEC on September 4, 2009;

- AMAG's Form 8-K filed with the SEC on July 1, 2009;

- AMAG's Form 8-K filed with the SEC on May 8, 2009;

- AMAG's Form 8-K filed with the SEC on April 30, 2009 (solely with respect to Item 8.01 therein); and

- AMAG's Form 8-K filed with the SEC on January 28, 2009.

As set forth in paragraph 1, *supra*, the Prospectus, Registration Statement, and all documents incorporated therein are collectively referred to herein as the "Offering Documents."

86.     In a Form 10-K for the fiscal year ended December 31, 2008, which was signed by the Individual Defendants and incorporated by reference into the Offering Documents, Defendants stated:

> In December 2007, we submitted an NDA to the FDA for marketing approval of *Feraheme* for the treatment of IDA in CKD patients. ***In October 2008, we received a Complete Response letter from the FDA with respect to our NDA for Feraheme requesting certain additional clinical information, information regarding certain observations noted during a recent FDA inspection at one of our Phase III clinical sites, and resolution of certain deficiencies noted during a recent FDA inspection of our Cambridge, Massachusetts manufacturing facility. We submitted a response in October 2008, and in December 2008 we received a second Complete Response letter from the FDA requesting data to clarify a specific CMC question, resolution of the deficiencies observed during the FDA's recent inspection of our manufacturing facility, and finalization of labeling discussions for Feraheme. We will need to address the issues raised by the FDA with respect to our NDA in a timely and satisfactory manner in order to obtain approval to market and sell Feraheme in the U.S.*** We are working with

the FDA to address the December 2008 Complete Response letter and believe that we will not need to conduct any additional clinical trials of *Feraheme* prior to FDA approval of *Feraheme*. ***Our NDA for Feraheme is supported by four pivotal Phase III clinical studies for Feraheme as an IV[intravenous] iron replacement therapeutic agent in patients with CKD.*** These trials have included patients with all stages of CKD, including patients with stages 1 through 5 CKD who are not on dialysis, patients with stage 5 CKD who are on hemodialysis or peritoneal dialysis, and kidney transplant recipients.

Two of our four pivotal Phase III studies were identically designed efficacy and safety studies in 304 and 303 non-dialysis patients with stages 1 through 5 CKD, respectively, who were randomized in a 3 to 1 ratio to receive either two rapid IV injections of 510 milligrams of *Feraheme* administered within a week or 200 milligrams of oral iron per day for three weeks. ***Both studies demonstrated a statistically significant achievement of all primary and secondary efficacy endpoints. The third pivotal Phase III trial was an efficacy and safety trial that included 230 CKD patients on hemodialysis and also demonstrated a statistically significant achievement of all primary and secondary efficacy endpoints.***

The fourth pivotal Phase III study was a double-blind, placebo-controlled, crossover safety study in 750 patients with all stages of CKD, comparing a single injection of 510 milligrams of *Feraheme* to normal saline placebo. Adverse events occurred in 21.3% of patients after *Feraheme* administration and in 16.7% of patients after placebo administration. On a blinded basis, meaning the physician was not aware whether the patient had received *Feraheme* or oral iron, these adverse events were deemed to be related to treatment by the investigator in 5.2% of patients after *Feraheme* administration and in 4.5% of patients after placebo administration. Serious adverse events, or SAEs, occurred in 2.9% of patients after *Feraheme* administration and in 1.8% of patients after placebo administration. On a blinded basis, these SAEs were deemed to be related to treatment by the investigator in one patient after *Feraheme* administration and in one patient after placebo administration. ***In this study, the single SAE attributed to the drug after Feraheme administration occurred in an 85 year-old male with non-dialysis dependent CKD, hypertension, coronary artery disease, cerebrovascular disease and a history of multiple drug allergies to ciprofloxacin, levofloxacin, and percocet. The patient experienced an anaphylactoid reaction with severe hypotension a few minutes after Feraheme administration, was treated with epinephrine and fully recovered. Across all phases of the Feraheme clinical development program with approximately 2,800 total administered doses of Feraheme, there were no cases of anaphylaxis and no deaths determined by the investigator to be drug-related.*** Drug-related SAEs were reported in three, or 0.17%, of 1,726 patients treated with *Feraheme*, one, or 0.35%, of 289 patients treated with oral iron, and one, or 0.13%, of 781 patients treated with placebo. (Emphases added.)

87.     Similar statements were made in the Form 10-Q for the fiscal quarter ended March 31, 2009, which was signed by Defendant Pereira and Defendant Arkowitz and incorporated by reference in the Offering Documents:

> In December 2007, we submitted a New Drug Application, or NDA, to the U.S. Food and Drug Administration, or the FDA, for marketing approval of Feraheme for the treatment of IDA in patients with chronic kidney disease, or CKD. ***In October 2008, we received a Complete Response letter from the FDA with respect to our NDA for Feraheme requesting certain additional clinical information, information regarding certain observations noted during an FDA inspection at one of our Phase III clinical sites, and resolution of certain observations noted during a recent FDA inspection of our Cambridge, Massachusetts manufacturing facility. We submitted a response to the Complete Response letter in October 2008, and in December 2008 we received a second Complete Response letter from the FDA requesting data to clarify a specific chemistry, manufacturing and controls question, resolution of the observations noted during the recent FDA inspection of our manufacturing facility, and finalization of labeling discussions for Feraheme.*** We are working with the FDA to address the December 2008 Complete Response letter and believe that we will not need to conduct any additional clinical trials of Feraheme prior to FDA approval of Feraheme. In addition, we have been engaged in active dialogue with the FDA and have recently been informed that the observations noted during the recent FDA inspection of our manufacturing facility have been adequately addressed and that a re-inspection of our manufacturing facility will not be required as a condition to approval of Feraheme. We will need to resolve all of the issues raised by the FDA in the Complete Response letters in a timely manner in order to obtain approval to market and sell Feraheme in the U.S. (Emphasis added.)

88.     The above-referenced statements in paragraphs 86 and 87 were materially false and misleading because Defendants failed to disclose that the FDA had in fact declined to approve Feraheme twice, on October 17, 2008 and on December 22, 2008, because (1) the occurrence of the case of anaphylaxis, contrary to Defendants' attempt to minimize it, was a cause of serious concern to the FDA because of its larger safety implications for the drug; and (2) the FDA found that the Company had underreported and/or minimized the occurrence of SAEs in patients.  As a result, investors remained unaware of material, adverse information

concerning the true safety profile of Feraheme and its impact on Feraheme's commercial

viability, including its ability to generate future revenue for the Company.

89.     The Prospectus discussed the FDA approval process for Feraheme:

> On June 30, 2009, *Feraheme* was approved for marketing in the U.S. by the FDA for use as an IV iron replacement therapy for the treatment of IDA in adult patients with CKD. In July 2009, we began to market and sell *Feraheme* in both the dialysis and non-dialysis markets, including to nephrologists, hematologists, dialysis organizations, hospitals and other end-users.

> Our NDA [New Drug Application] for *Feraheme* was supported by four pivotal Phase III clinical studies for *Feraheme* as an IV iron replacement therapeutic agent in patients with CKD. These trials included patients with all stages of CKD, including patients with stages 1 through 5 CKD who were not on dialysis, patients with stage 5 CKD who were on hemodialysis or peritoneal dialysis, and kidney transplant recipients.

90.     The statements made in the Prospectus referenced in paragraph 89 above were

materially false and misleading when made because in discussing the FDA approval of Feraheme

and the Phase III clinical trials, Defendants failed to disclose that the FDA had in fact declined to

approve Feraheme on October 17, 2008 and on December 22, 2008, because (1) serious safety

concerns regarding Feraheme were raised during the Phase III clinical trials, including the

occurrence of a case of anaphylaxis and (2) the Company had been determined by the FDA to

have underreported and/or minimized the occurrence of SAEs in patients.  As a result, investors

remained unaware of material, adverse information concerning the true safety profile of

Feraheme and its impact on Feraheme's commercial viability, including its ability to generate

future revenue for the Company.

91.     The Prospectus purported to warn about the risk factors in purchasing the

Common Stock stating in pertinent part as follows:

> The degree of market acceptance of *Feraheme* depends on a number of factors, including but not limited to:

- Our ability to demonstrate to the medical community, particularly nephrologists, hematologists, dialysis clinics and others who may purchase or prescribe *Feraheme*, the clinical efficacy and safety of *Feraheme* as an alternative to current treatments for iron deficiency anemia in both dialysis and non-dialysis chronic kidney disease patients;

- The ability of physicians and other providers to be adequately reimbursed for *Feraheme* in a timely manner from payors, including government payors, such as Medicare and Medicaid, and private payors, particularly in light of the expected "bundling" of costs of providing care to dialysis patients;

- The relative price of *Feraheme* as compared to alternative iron replacement therapeutic agents;

- The actual or perceived convenience and ease of administration of *Feraheme* as compared to alternative iron replacement therapeutic agents;

- The effectiveness of our sales and marketing organizations and our distribution network; and

- ***The development of unanticipated adverse reactions to Feraheme resulting in safety concerns among prescribers.*** (Emphasis added.)

92.    The statements made in the Prospectus referenced in paragraph 91 above were materially false or misleading because although they mentioned the risk of the development of SAEs, they failed to disclose the ***existing facts*** that (1) Feraheme use was linked to at least twenty-three (23) reported SAEs, including several potentially deadly anaphylactoid and cardiac-related events, and at least one fatality; and (2) such reports were occurring at a significant rate of incidence.  As a result, investors remained unaware of material, adverse information concerning the true safety profile of Feraheme and its impact on Feraheme's commercial viability, including its ability to generate future revenue for the Company.  The existence and severity of these SAEs could have, and did, trigger adverse action by the FDA in the form of stricter labeling warnings, and were likely to, and did, impact physicians' use of Feraheme as an alternative to competing treatments for iron deficiency in both dialysis and non-dialysis CKD patients.

93.     Additionally, the fatality that AMAG reported to the FDA on December 31, 2009 is a material fact bearing on the overall safety profile and commercial viability of Feraheme that should have been disclosed to investors in the Offering Documents in light of the following: (1) the Company claimed that no deaths had occurred as a result of Feraheme use during the clinical trials; therefore, a death, coupled with the pattern of SAEs associated with Feraheme use post-marketing, was significant; and (2) the FDA's stated concern regarding a single case of anaphylaxis during clinical trials resulted in the denial of FDA approval for Feraheme; therefore, a more severe event such as a fatality could have, and did, trigger FDA action, in the form of stricter labeling warnings, and otherwise affect physicians' use of the treatment, thereby impacting the commercial viability of Feraheme.

94.     The Prospectus further stated in pertinent part as follows:

***Significant safety or drug interaction problems could arise with respect to Feraheme even after FDA approval, resulting in recalls, restrictions in Feraheme's label, or withdrawal of Feraheme from the market.***

Discovery of previously unknown problems with an approved product may result in recalls, restrictions on the product's permissible uses, or withdrawal of the product from the market. The data submitted to the FDA as part of our new drug application was obtained in controlled clinical trials of limited duration. ***New safety or drug interaction issues may arise as Feraheme is used over longer periods of time by a wider group of patients taking numerous other medicines and with additional underlying health problems.*** In addition, as we conduct additional clinical trials for *Feraheme*, new safety problems may be identified which could negatively impact both our ability to successfully complete these studies and the use and/or regulatory status of *Feraheme* for the treatment of iron deficiency anemia in patients with chronic kidney disease. ***These new safety or drug interaction issues may require us to provide additional warnings on the Feraheme label, directly alert healthcare providers of new safety information, or narrow our approved indications, any of which could reduce the market acceptance of Feraheme. In addition, if significant safety or drug interaction issues arise, FDA approval for Feraheme could be withdrawn, and the FDA could require the recall of all existing Feraheme in the marketplace.*** The FDA also has the authority to require the recall of our products if there is contamination or other problems with manufacturing, transport or storage of the product. A government-mandated recall or a voluntary recall could divert managerial and

financial resources, could be difficult and costly to correct, could result in the suspension of sales of Feraheme, and could have a severe adverse impact on our potential profitability and the future prospects of our business. (Emphases added.)

We may also be required to conduct certain post-approval clinical studies to assess known or suspected significant risks associated with *Feraheme*. The Food and Drug Administration Amendments Act of 2007 expanded the FDA's authority. Under the Food and Drug Administration Amendments Act, the FDA may: (i) require manufacturers to conduct post-approval clinical studies to assess known risks or signals of serious risks, or to identify unexpected serious risks; (ii) mandate labeling changes to a product based on new safety information; or (iii) require sponsors to implement a Risk Evaluation Management Strategy where necessary to assure safe use of the drug. If we are required to conduct post-approval clinical studies or implement a Risk Evaluation Management Strategy, or if the FDA changes the label for Feraheme to include additional discussion of potential safety issues, such requirements or restrictions could have a material adverse impact on our ability to generate revenues from sales of Feraheme, or require us to expend significant additional funds on clinical studies.

95.     The statements made in the Prospectus referenced in paragraph 94 above concerning the possibility of new safety issues arising through continued marketing of Feraheme were materially false and misleading because although the Prospectus mentioned the risk of the development of SAEs, it failed to disclose the ***existing facts*** that (1) Feraheme use was linked to at least twenty-three (23) reported SAEs, including several potentially deadly anaphylactoid and cardiac-related events, and at least one fatality; and (2) such reports were occurring at a significant rate of incidence.  As a result, investors remained unaware of material, adverse information concerning the true safety profile of Feraheme and its impact on Feraheme's commercial viability, including its ability to generate future revenue for the Company.  The existence and severity of these SAEs could have, and did, trigger adverse action by the FDA in the form of stricter labeling warnings, and were likely to, and did, impact physicians' use of Feraheme as an alternative to competing treatments for iron deficiency in both dialysis and non-dialysis CKD patients.

96.     The reported incidence of SAEs and fatalities linked to Feraheme use was particularly material in light of the fact that the FDA had *twice* declined to approve Feraheme due in large part to a *single* case of anaphylaxis reported during the clinical trials, and because the Company had been determined by the FDA to be underreporting and/or minimizing the occurrence of SAEs.  Because the occurrence of the anaphylactic reaction and other serious adverse events or reactions were clearly of concern to the FDA in its approval process for Feraheme, any post-marketing reports of SAEs raised the risk that Feraheme's status as an FDA-approved drug would be adversely impacted, potentially resulting in its removal from the market or the imposition of strict labeling warnings, or negatively impacting physicians' use of the treatment over competitors, thereby affecting the drug's commercial viability and the Company's future earnings.  However, investors were not informed of Feraheme's post-marketing safety profile, including the existence, severity, or frequency of any SAEs reported to the Company.

97.     The Offering Documents failed to disclose that a material portion of the Company's revenues were derived from the illegal and materially misleading marketing practices identified by the FDA in the Warning Letter, in that the Company's website made certain representations concerning Feraheme's safety and use approved by the FDA but failed to disclose risks associated with Feraheme use and included representations concerning unapproved uses.  The full and accurate disclosure of these risks and uses would result in a material and adverse impact on the Company's stock price and the Company's revenues derived from sales of Feraheme.

98.     The Offering Documents also failed to disclose that AMAG had not complied with 21 C.F.R. §314.81(b)(3)(1) in submitting the requisite documentation to the FDA regarding labeling and advertising statements promoting GastroMARK and Feraheme.  The full and

accurate disclosure of AMAG's failure to comply with applicable FDA regulations would result in a material and adverse impact on the Company's stock price and the Company's revenues derived from sales of Feraheme.

99.     Under applicable SEC rules and regulations governing the preparation of the Registration Statement and Prospectus, the Registration Statement and Prospectus were required to disclose the safety profile of Feraheme, including the amount, nature, and severity of SAEs that had been reported to the Company.  The Registration Statement and Prospectus failed to contain any such disclosures.  Specifically:

(a)     Under Item 303(a)(3)(ii) of Regulation S-K, an issuer is required to, among other things, "describe any known trends or uncertainties that have had or that the registrant reasonably expected will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  At the time of the Offering, SAEs were being reported, but not disclosed to the public.  The amount, nature, and severity of SAEs related to Feraheme use would continue to have an unfavorable impact on the Company's revenues and income from continuing operations, and therefore, were required to be disclosed in the Prospectus, but were not; and

(b)     Pursuant to Item 3 of Form S-1, the Registration Statement was required to furnish the information required by Item 503 of Regulation S-K.  Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative."  The material fact that safety issues existed as to Feraheme was a significant factor that made the Offering "risky or speculative" because the Company lacked critical information about the source of its revenues

and the likelihood that those revenues would continue in the future.  Thus, this information was required to be disclosed in the Prospectus, but was not.

## VII.  THE TRUE SAFETY PROFILE AND COMMERCIAL VIABILITY OF FERAHEME IS REVEALED, CAUSING A 71% DECLINE IN AMAG'S STOCK PRICE

### A.  News of the SAEs Begins to Leak Out

100.  The Offering Documents failed to disclose that the Company received *any* reports of SAEs from the use of Feraheme.  The existence of SAEs was first disclosed in a Summer Street analyst report issued on February 4, 2010, which revealed two reported cases of anaphylaxis and one potentially related death among Feraheme users.

101.  More particularly, on February 4, 2010, Summer Street analyst Carol Werther issued a report downgrading AMAG from buy to neutral.  The report stated in pertinent part:

- *Field checks reveal SAEs but exact incidence rate is unclear.*  [Original emphasis.] *We are aware of several patients hospitalized with anaphylactoid reactions to Feraheme. We are aware of one death that may or may not be directly related to Feraheme.* [Emphasis added.] Since we do not know how many patients have been treated since the July launch, it is impossible to know if it is within the labels' "In clinical studies serious hypersensitivity reactions were reported in 0.2% (3/1726) of subjects receiving Feraheme.  While the incidence could be in line with the 0.2% in Feraheme's label, there is no way to know.

- *Consultants are continuing to use Feraheme but adoption rate is slowing.* [Original emphasis.] *Specifically our consultants are: 1) delaying use in their dialysis unit; or 2) only administering Feraheme to patients without 1 or 2 drug allergies; or 3) only administering in outpatient clinics affiliated with hospitals* - - the label states that physicians need[] [sic] to "Observe patients for signs and symptoms of hypersensitivity for at least 30 minutes following Feraheme injection and only administer the drug when personnel and therapies are readily available for the treatment of hypersensitivity reactions." While there was one SAE (ER visit in a patient with multiple drug allergies) despite the exclusion of these patients from the clinical trials, the label doesn't currently contain prominent warnings to exclude those with multiple allergies.  *These events could raise the risk of a more prominent labeled warning.* [Emphases added.]

- ***We are reducing our Feraheme sales forecast.*** [Original emphasis.] Our model is highly dependant on the predialysis and ultimately other IDA treated in the clinician's office. Following resolution/explanation of these reactions, we expect growth to pick up in H2:10. We are lowering our Feraheme estimates to $73MM in 2010, $126MM in 2011, $194MM in 2012, $286MM in 2013 and $374 in 2014 from $108MM, $172MM, $279MM, $381MM and $502MM respectively.

- ***Downgrading to Neutral.*** [Original emphasis.] We understand that when Ferrlicit was launched a similar pattern of infusion reactions occurred that later were deemed unimportant. ***Nevertheless we expect the sales trajectory to slow near term and our model changes push out profitability to 2012 from 2011.*** [Emphasis added.] We do not necessarily believe that Feraheme's longer term potential will be negatively affected.

102.    In response to the Summer Street report and downgrade, AMAG's shares fell by over $7.00, or more than 15% from $45.25 per share to $38.12 per share, on heavy trading volume of 8,573,900 shares, which had increased from an average trading volume of 547,500 shares.

103.    Following the Summer Street report, the Company issued a press release on February 5, 2010, entitled, "AMAG Pharmaceuticals Provides Feraheme® Safety Update" in which the Company confirmed what was reported by Summer Street and revealed for the first time that it had received reports of forty (40) SAEs, including (at least) one death:

AMAG Pharmaceuticals, Inc. (NASDAQ: AMAG), a biopharmaceutical company focused on the development and commercialization of a therapeutic iron compound to treat anemia and novel imaging agents to aid in the diagnosis of cancer and cardiovascular disease, today provided a safety update on Feraheme(R) (ferumoxytol) Injection for intravenous use. ***Since the commercial launch of Feraheme in July 2009, serious adverse events have been reported at a rate consistent with that contained in the U.S. package insert. Of the estimated 35,000 patient exposures to date, 40 serious adverse events have been reported, an approximate rate of 0.1 percent. No mortality signal has been observed. A single reported death occurred in a patient two days post-Feraheme treatment, which the Company does not believe was the result of Feraheme.***

**Important Safety Information about *Feraheme***
*Feraheme* is indicated for the treatment of iron deficiency anemia in adult patients with chronic kidney disease. Feraheme is contraindicated in patients with evidence of iron overload, known hypersensitivity to *Feraheme* or any of its components, and patients with anemia not caused by iron deficiency.

In clinical studies, hypotension was reported in 1.9% (33/1,726) of subjects receiving *Feraheme*, including three patients with serious hypotensive reactions. Serious hypersensitivity reactions were reported in 0.2% (3/1726) of patients. Patients should be observed for signs and symptoms of hypersensitivity for at least 30 minutes following *Feraheme* injection and the drug should only be administered when treatment for hypersensitivity reactions is readily available. Excessive therapy with parenteral iron can lead to excess storage of iron with the possibility of iatrogenic hemosiderosis. Patients should be regularly monitored for hematologic response during parenteral iron therapy. As a superparamagnetic iron oxide, *Feraheme* may transiently affect magnetic resonance diagnostic imaging but will not affect X-ray, CT, PET, SPECT, ultrasound, or nuclear imaging.

In clinical trials, the most commonly occurring adverse reactions in *Feraheme* treated patients versus oral iron treated patients were diarrhea, nausea, dizziness, hypotension, constipation and peripheral edema. (Emphasis added.)

104.    On that same day, Defendants conducted a conference call to discuss the press release.  Defendant Pereira stated in pertinent part as follows:

Our top priority at AMAG is patient safety and as such we have a robust pharmacovigilance program in place. Since the commercial launch of Feraheme in July 2009, serious adverse events have been reported at a rate consistent with that contained in the U.S. package insert. Of the estimated 35,000 patient exposures to-date, 40 serious adverse events have been reported, an approximate rate of 0.1%. ***These include cases of hypertension and some cases of allergic reactions, including anaphylactoid or anaphylactic events.*** These events are known to occur with intravenous iron administration as a class.

I'd like to remind you that in post marketing adverse event reporting, all reported events are captured irrespective of causality. ***To-date, no mortality signal has been observed. The single reported death occurred in a patient two days post-Feraheme treatment, which we do not believe was a result of Feraheme.*** Like most patients with chronic kidney disease, this patient had significant comorbidities.

As you know, the morbidity and mortality rates among non-dialysis dependent and dialysis dependent CKD patients in general have been shown to be high, largely due to the underlying disease. ***I'd like to remind you that in the***

*ferumoxytol registrational program submitted as part of our NDA, there were a total of 2,074 subjects and 31 deaths were observed. The mortality rate was 1.1% among ferumoxytol treated subjects compared to 2.8% among subjects treated with oral iron.* None of these deaths were considered to be related to study treatment. We have provided as much granularity on this subject as we are able to at this time. (Emphases added.)

105.    Following the Company's press release and conference call, AMAG's stock price once again declined, this time from $38.12 per share to $37.77 per share.

106.    The February 5, 2010 press release misleadingly calculated the reported incidence rate of SAEs post-marketing as approximately .1% based upon "the estimated 35,000 patient *exposures* to date." (Emphasis added.)  The Company inaccurately claimed that this rate was "consistent with that contained in the U.S. package insert" which was disclosed as occurring in "0.2% (3/1726) *patients*" during clinical trials. (Emphasis added.)  By calculating the post-marketing incidence rate based upon patient exposures rather than number of patients as calculated during clinical trials, the Company used a different metric that effectively lowered the incidence rate.  In other words, AMAG's new metric counted every *injection* of Feraheme post-marketing, and incorrectly compared it to an incidence rate calculated based upon the number of *patients* that used Feraheme during clinical trials, regardless of number of exposures.  Since Feraheme is a drug that is administered in a minimum of two and as many as four injections, the number of *exposures* is much higher than the number of *patients* who have used Feraheme, making any comparison between the two numbers deceptive and effectively understating the post-marketing incidence rate by as much as .35%, from a post-marketing rate that is potentially as high as .45%.

107.    Moreover, allergic reactions are far more likely to occur initially on the first injection rather than on a subsequent injection; thus, counting a subsequent exposure as a non-adverse event is misleading.

108.    The table below calculates a true comparison of SAE rates, based upon the per patient metric used and reported during clinical trials.  These calculations are based on the forty (40) reported SAEs disclosed by the Company in the February 5, 2010 press release and take into account the various doses in which Feraheme may have been administered:

| Number of Patients/Exposures | Actual Rate of Incidence |
| --- | --- |
| 35,000 patient exposures | 0.11% (40/35,000 x 100) |
| 17,500 patients (2 injections each, for a total of 35,000 patient exposures) | 0.23% (40/17,500 x 100) |
| 11,666 patients (3 injections each, for a total of 35,000 patient exposures) | 0.34% (40/11,666 x 100) |
| 8,750 patients (4 injections each, for a total of 35,000 patient exposures) | 0.45% (40/8,750 x 100) |

109.    The next business day after AMAG's press release, on February 8, 2010, Summer Street issued a follow-up report entitled "Feraheme Safety Update Raises more Questions than Answers."  In the report, the analyst questioned management's calculated rate of SAEs and noted that notwithstanding the fact that the number of SAEs most likely *exceeded* forty (40) because of the recency of the reports and time lag in reporting by health care professionals, there has been only one reported SAE and one death associated with use of Venofer®, Feraheme's primary competitor, in the ten years that Venofer® had been on the market:

> AMAG's safety update reveals 40 SAEs in 35K patient exposures. Their calculated rate is 0.1% and the label's is 0.2%. ***However the two rates are calculated differently: 3/1726 patients vs 40/35,000 exposures, thus is not a valid comparison.*** Exposures count patients that safely received multiple feraheme doses. ***The rate we really want to know is the number of SAEs/ the number of patients.***

• *Our consultants are not reassured as they believe neither the numerator nor the denominator is known. First, they know that not all SAEs have been reported to AMAG or the FDA as some of these events are very recent. It can take 2-3 weeks to file a report. We knew of only one SAE in mid December NY, now we have confirmed four and two of those have not been reported yet. Therefore there are more than 40. Second, perhaps AMAG knows how many doses have been sold or [are] at distributors, however there is no way they can know how many doses have been administered. Our consultants have not used all of the Feraheme they have purchased and we know some of Q4's $12-13MM is in inventory.* Third, they would like to know the definition of SAE and if it is the same as in the clinical trials (to insure a true comparison to the label). If it is the same definition, our understanding is that it was death, hospitalization for any cause or an unexpected event. Our clinicians were clear to say that a blood pressure drop that is treatable quickly with saline is not an SAE and they would not report it as such. The label is for 1.9% hypotension rates which are similar to Ferliccit's label.

• We still think some of the SAEs may be in patients with multiple drug allergies. We have spoken to several doctors that were involved with the clinical trials that have acknowledged that these patients were excluded and should not be treated. We think the four NY cases were in patients with multiple drug allergies. If this is a common factor, this is quite simple to address.

• Fereheme's [sic] perceived safety profile is key. Many predialysis patients are not treated with IV iron due to the multiple doses necessary and the risk of adverse events in the out patient setting. *Our conversations with clinicians reveal their experience with Venofer is excellent: we have heard of one SAE and one death in 10 years of Venefor [sic] use.* It is in best interest of AMAG and Feraheme to be accurate and proactive in providing details surrounding the SAEs to the medical community. (Emphases added.)

110.    Following this report, AMAG's stock price dropped once again, from $37.77 per share on Friday, February 5, 2010 to close at $36.67 per share on Monday, February 8th, on heavy trading volume of 3,120,600 shares.  In total, between February 3, 2010 and February 8, 2010, AMAG's stock price dropped by $8.58 per share, a decline of 19%.

**B.     The FDA Mandates Stricter Warnings Concerning SAEs on Feraheme's Label**

111.    As set forth herein, during the third quarter earnings call held on October 28, 2010, the Company announced for the first time that the FDA had created a Tracked Safety Issue

regarding Feraheme, that the Company was meeting with the FDA to discuss the cardiac-related

SAEs and changes to be made to Feraheme's labeling as mandated by the FDA, including the

potential for a boxed warning, the most serious warning imposed by the FDA that is designed to

alert patients and health care providers to SAEs resulting from a product's use.  Questions from

analysts during the earnings call focused on the true rate of incidence and severity of the SAEs

and their impact on the Company's business, including the effect on future sales and revenues of

any labeling changes, the impact on clinical trials to broaden the indications for Feraheme use, as

well as the impact on the approval process in Europe.  For example, the following exchange

occurred between a Citi analyst and Defendant Pereira:

> Q: Where, how—the most obvious question is how realistic is it, do you think, that you will get a black box?

> A: This is Brian, Yaron. We are in discussions with the agency on the broad issues regarding updating the label.  As I said in my call, there are several post-marketing events that have occurred that will come into the label.  These are events which are similar to those that already exist in the labels of the other IV iron on the market.

> However, based on our evaluation of the post-marketing safety data, we do not believe that a boxed warning is warranted for Feraheme.  At this point, we are in discussions with the agency so it's hard to handicap what the outcome is.

> Q: And if you do get a black box warning, what do you think the outlook for the brand is? So this is really a question of—in many ways it's going to be a question of existence for the brand at that point.  The whole convenience benefit at that point is going to be dramatically damaged. Do you agree with that?

> A: Well, not quite, Yaron, Feraheme has, as you know, unique characteristics.  Its two doses of 500 milligrams each can be given in 17 seconds.  Obviously, if Feraheme does receive a boxed warning, it will make the commercial effort more challenging.   But I must remind you that in some segments of the IV iron market, the dominant IV iron used even today is Dextran, which has a boxed warning. So I would say that we need to wait until this plays out, at which time we'll be in a better position to assess the U.S. opportunity and our strategy going forward.

112.     The following exchange took place between a Morgan Stanley analyst and
Defendant Pereira concerning the severity and frequency of cardiac-related SAEs:

> Q: Yes, hey guys. Thanks for taking the question.  So the first one is I
> know this got asked, but I'm still not clear on what the answer is.  So is what the
> FDA's concerned about in terms of the error safety database, is it the absolute
> number of events, that there are serious cardiac events that they're seeing? Or has
> there been a change in the pacing not just from the beginning of the year to now,
> but from 1Q to 2Q into 3Q in terms of the number of events that they are seeing
> and specifically is that what's concerning them?

> A: If you'd note, FDA put us on the TSI in the DARRTS system in late
> August, but we were informed about this decision much earlier.  We would
> suggest that this was based on their analysis of the first quarter data this year.
> Again, this is speculative. We can't say with absolute certainty what prompted the
> FDA to list Feraheme.

113.     In an exchange between Defendant Pereira and an analyst with Robert Baird, the
analyst challenged the Company's assessment that the SAEs reported were in line with SAEs
reported in Feraheme's packaging insert.  The Company further acknowledged the significance
of the creation of a TSI by the FDA both with regard to physicians' prescribing practices for
Feraheme and with regard to investors:

> Q: Just one question. I'm a little confused about one of the things you
> mentioned in your commentary about one of the primary drivers of decreased use
> utilization being safety concerns.   Knowing, obviously, that you've got a
> surveillance system that's showing essentially issues that are in line with the
> label. Yet, you do have this issue with the FDA. What is really the mechanism of
> that or what's the genesis of the concern among physicians? Are they aware of the
> FDA AERS database is that really the driver, or was there maybe sort of a word
> of mouth thing going on between docs. Thanks.

> A: Marshall, I think that both Gary and I will offer pieces of color in this.
> I'll take the first shot. As you know, in 2010 the separation between the investor
> community and the prescribing community has continued to narrow.  Physicians
> today read their medical business journals more often than they did in the past.
> **And when events such as listing of the drug on the TSI or a company
> withdrawing from an investor conference because of ongoing discussions
> with the agency, it tends to I would say go viral.**  And many physicians are well
> in tune with what's happening on the investors side.

**And hence that does contribute to prescribing patterns.**  Now again as I said, I hope that with the label being finalized, with us being able to speak more freely with prescribing docs and in the not too distant future once we have comparative data for Feraheme versus the other IV irons, we'll be able to provide folks far more clarity.  And Gary has a couple of comments as well to give you a more complete picture.

<A - Gary J. Zieziula, Chief Commercial Officer & Executive Vice President: So, Chris, **from a business perspective, safety we feel definitely played a role in our performance in the third quarter particularly in the Nephrology segment. And there were two large Nephrology clinics that actually decided to stop using Feraheme in the third quarter, relatively early in the third quarter, and we felt almost the immediate impact of that. Now that was either the result of having an adverse event occur in the clinic or hearing about an adverse event occurring in a neighboring clinic.**

As you can well imagine, **it's a close-knit community and when nephrologists have an experience, a bad experience and maybe have not had a significant experience up to that point in time using a relatively new product, they become concerned and in several cases clinics stopped using Feraheme and moved to other products.**

We haven't seen that occur in other segments as much as in the Nephrology segment.  So to your question, **we do have specific examples where safety played a role in impacting the business in the third quarter** as was stated in our remarks. (Emphases added.)

114.    An analyst with Jefferies queried Defendant Pereira about the impact on

enrollment rates in clinical trials to expand the indication for Feraheme:

Q: Okay. And then given this safety concern, how do you think that this may impact your current ongoing phases of your trials in IDA?

A: Our IDA trials are ongoing. They're enrolling well and they have not been a subject of discussion with the Agency.

Q: But how about the enrollment rate? Do you think that it could slow down?

A: We have not seen any change in the enrollment rate. They are on track.

115.    Another analyst with Leerink Swann expressed concern about the fatalities

linked with Feraheme use post-marketing:

Q: Thanks. I had a question similar to the last. I was curious about the 10 deaths, because on the surface it wouldn't seem like the overall level of SAE would justify this amount of concern but perhaps the severity is what the FDA detected. So, how does the 10 deaths amongst 146 SAE and 155,000 exposures, how does that mortality rate compare to the overall death rate in the CKD population? And also what you know about other IV irons?

A: Well, I think, Joe, that's an important question that can bring all the pieces of information into context. So let's start from the highest level. Overall, the mortality rate in Dialysis patients is 23% per year. In CKD patients it varies based on the stage of disease. Those who have more advanced stages of disease, that's stages three and four, it is closer to the mortality rate in Dialysis and, as you'd expect, it's lower.

As a frame of reference, you will recall two and half years ago in February of 2008, we provided you information on our clinical development program. In our clinical development program among 2,000-plus patients, subjects who were enrolled, who had received about 2,800 doses, there were 31 deaths and the mortality rate was 1.1% in Feraheme-exposed patients and 2.8% in oral iron-exposed patients. This provides you a context that these are sick patients.

The 10 deaths in patients who were exposed to Feraheme have occurred from the same day to several weeks after administration. So again as I said earlier, in the post-marketing environment both for SAEs and deaths, it's very hard to ascribe causality. With respect what is the state of affairs with other IV irons, we have no direct head-to-head studies and so it's hard to address this. But similar events are highlighted in the package inserts of all the existing IV irons on the market.

116.    Summer Street analyst Carol Werther asked the following question

concerning the FDA's concerns regarding Feraheme's safety:

Q: Thank you. Brian, I'm still trying to understand, I mean if these serious adverse events are within your label I'm having a hard time trying to figure out how you might end up with a black box. The other, I mean, can you help me out a little bit, like what is the FDA seeing that they're concerned about?

A: Well, we can't speak for the FDA, but **we believe that their concern was that some of the events that we have seen in the post-marketing environment haven't been explicitly listed in our label.** And as to how the FDA is going to approach IV irons as a class, it's not ours to speculate. (Emphasis added.)

117.   A Citi analyst asked about the impact on approval of Feraheme in Europe:

Q: Yes, hi, thanks for taking my follow-up. Guys, if I may, I just wanted to get your thoughts as to how do you think these new events or these new occurrences, which were not known at the time in which you filed and got approved, any sense as to how would that impact the potential for approval and outlook in Europe?

A: Well, Yaron, a couple of comments I'd like to make. **One is that many of the types of events that we observed in clinical trials have been observed in the post-marketing environment but were not explicitly listed in our labels** and we plan to update that, our label, to reflect that.

With respect to Europe, the review is ongoing and I don't believe it's appropriate to speculate. First let's see how the resolution of our discussions with the U.S. FDA pans out before trying to answer that question. At this point in time that's where it is.

118.   A JP Morgan analyst posed a question about the pattern of cardiac-related

SAEs:

Q: Hi guys. Thanks for the follow-up. So, a little bit different way to ask the previous question, when you look at the SAEs, I know it's exploratory but is there any defining feature among the patients who've had a cardiac event?

A: To be honest, Geoff, we have cut it every which way to identify-- with the data that we have. As you would expect, as any responsible organization will try and see if there is any particular patient type, any particular dosing paradigm, any site of care and we don't see any specific pattern. These are sick patients in general. So, it's very hard and we've tried our best.

119.   The JP Morgan analyst also asked about the relationship between a TSI

and a boxed warning:

Q: Okay. And then last question, do you have a sense of the drugs that made the docs list, which ones don't have a black box?

A: We haven't done that analysis. There have been many products which have been on the TSI list for a long while. I think different organizations approach this differently. As I said earlier, for us safety is our priority. When we got listed, we reached out to the agency to find out what is the basis.

120.    Another question was posed by a Jefferies analyst regarding the Company's claimed rate of incidence for cardiac-related SAEs:

> Q: Thanks for taking the follow-up question. Regarding the cardiac disorder event, in the clinical trials the instance rate, instance was less than 1%. So, now these events keep coming up and it sounds like they could be reflected in the label. Should we assume that the cardiac events that you are seeing in post-marketing is approaching 1% or over 1%?
>
> A: Well, in the post-marketing environment there is no percentage cutoff, Eun. When you observe events in the post-marketing environment you list them. If you look at labels of the other IV irons in the market, all of these events are listed in their – many of these events are listed in their labels.

121.    Although AMAG and Defendants Pereira and Arkowitz sought to downplay both the incidence of SAE's and the Company's discussions with the FDA, the news concerning the true rate of incidence of SAEs post-marketing, their severity, and the fatalities reported caused an immediate negative reaction in the market.  The following day, October 29, 2010, AMAG's stock price fell from the previous day's close of $20.01 per share to close at $15.91 per share, on heavy trading volume of 4,619,600, an increase from the average volume of 683,500 the previous day.

122.    The stock price continued to decline precipitously as investors awaited news of the labeling changes to be imposed by the FDA.  Between October 29, 2010 and November 26, 2010, when the labeling changes were announced by AMAG, the stock fell to $14.05 per share, on extremely low trading volume of just 142,500, representing a price decline of *71%* from the Offering price of $48.25 per share.

123.    The resulting low level of investor confidence in the Company's performance is reflected in an article posted on TheStreet.com on December 1, 2010, entitled "Vote for the Worst Biotech CEO" listing Defendant Pereira as one of four contenders for the title:

Pereira [] deserves inclusion on this list of worst biotech CEOs nominees because he promised way too much and delivered far too little throughout 2010. ***Almost everything Pereira promised about the Feraheme launch failed to materialize, while the critics with questions he somewhat arrogantly brushed aside in the early days of the launch have been proven right.***

Feraheme today fights an uphill battle. Changes to the way kidney disease drugs and services are reimbursed have made Feraheme's convenience factor irrelevant and its premium price a liability. A new FDA-mandated Feraheme label warns doctors to watch patients for potentially life-threatening allergic reactions. Quarterly sales of the drug have fallen consistently below expectations, forcing the company to restructure and retool its marketing approach, which still seems to have no clear direction.

Pereira is a nephrologist who repeatedly told investors to trust his hands-on expertise in the chronic kidney disease market. He, better than most, knew how to make Feraheme a commercial success, he said. Well, one year later, ***Feraheme borders on failure, and whatever reservoir of trust Pereira built with Wall Street is gone. Amag shares are down 71% this year from their peak in mid-January. Shareholders are angry, and some are starting to push the company's board to make significant changes.*** (Emphases added.)

### C.    Feraheme Sales Plummet As Health Care Providers Become Aware of the Safety Issues Related To Feraheme Use

124.    In December 2009, the last full month reported prior to the Offering, AMAG reported provider demand for Feraheme at approximately 8,700 grams (excluding sales due the Company's Launch Incentive Program).  In January 2010, as physicians were increasingly reporting SAEs to AMAG sales representatives, provider demand for Feraheme dropped to approximately 3,200 grams (excluding sales due to the Company's Launch Incentive Program), as reported in the Company's fourth quarter 2009 ("4Q09") earnings slides presented to analysts during an earnings call.  In February 2010, provider demand for Feraheme remained significantly below December 2009 levels, equaling approximately 4,100 grams, as reported in the Company's 4Q09 earnings slides.  When reporting its results for the second quarter 2010, AMAG revealed in a conference call with analysts that it would no longer present end-to-end

monthly figures.  The Company reported that approximately 8,200 grams were in provider inventory in the second quarter 2010.

125.    During the third quarter 2010, in what was referred to as a "challenging period" by Defendant Pereira, the Company reported a net loss of approximately $17 million.  Feraheme sales declined sharply in the third quarter, reporting $15.1 million in Feraheme net product revenues, which was $900,000 lower than the second quarter.  Overall provider demand dropped by 11%, with demand dropping more than 20% in certain segments, and a large customer returned $1.9 million of Feraheme inventory to the Company.  Two large customers stopped using Feraheme entirely as set forth in paragraph 113 herein.  During the Q3 earnings call held on October 28, 2010, the Company attributed the sharp decline in sales of Feraheme in large part to safety concerns regarding Feraheme.

## VIII.   CAUSES OF ACTION

### COUNT I

### For Violations of Section 11 of the Securities Act Against All Defendants

126.    Lead Plaintiff repeats and realleges each and every allegation contained above.

127.    This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

128.    The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to adequately disclose material facts as alleged herein.

129.    AMAG is the registrant for the Offering.  As issuer of the shares, AMAG is strictly liable to Lead Plaintiff and the Class who acquired Common Stock pursuant to and

traceable to the Registration Statement and incorporated Offering Documents for the misstatements and omissions contained therein in violation of Section 11 of the Securities Act.

130.    The Individual Defendants each signed the Registration Statement.  In addition, Defendants Bonventre, Narachi, Perez, Russell, Scoon and Zwanziger were directors of AMAG at the time the Registration Statement and Offering Documents were issued.

131.    Each of the Underwriter Defendants was an underwriter for the Offering.

132.    The Individual Defendants and the Underwriter Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statement and Offering Documents.  The Individual Defendants and the Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact.  Therefore, the Individual Defendants and the Underwriter Defendants acted negligently and are liable to Lead Plaintiff and other members of the Class who acquired AMAG Common Stock pursuant to or traceable to the Registration Statement and Offering Documents.

133.    Lead Plaintiff and the Class have sustained damages.  The value of AMAG shares declined substantially subsequent to and due to Defendants' violations.

134.    At the times they purchased AMAG shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to January 21, 2010.

135.    Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiff filed this Complaint.  Less than three years has elapsed between the time that the

securities upon which this Count is brought were offered to the public and the time Lead Plaintiff

filed this Complaint.

**COUNT II**

**For Violations of Section 12(a)(2) of the Securities Act Against Defendant AMAG,
Defendant Pereira, Defendant Arkowitz, and the Underwriter Defendants**

136.    Lead Plaintiff repeats and realleges each and every allegation contained above.

This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §

77l(a)(2), against Defendant AMAG, Defendant Pereira, Defendant Arkowitz and the

Underwriter Defendants on behalf of Lead Plaintiff and members of the Class who purchased or

acquired registered shares of AMAG Common Stock pursuant to the Prospectus and Offering

Documents and any other oral or written communications used to solicit the Offering, including

free writing prospectuses and road shows, and were damaged by the acts alleged herein.

137.    Defendant AMAG sold, offered for sale, and solicited the sale of the Common

Stock by the use of means or instruments of transport or communication in interstate commerce

or of the mails, by means of the Prospectus or oral or other written communications, including

the Offering Documents.  The Prospectus and Offering Documents contained untrue statements

of material fact and omitted other facts necessary to make the statements not misleading, and

failed to disclose material facts, as alleged herein.

138.    Defendant Pereira and Defendant Arkowitz solicited the sale of the Common

Stock by the use of means or instruments of transport or communication in interstate commerce

or of the mails, by means of the Prospectus or oral or other written communications, including

the Offering Documents and road shows.  The Prospectus and Offering Documents contained

untrue statements of material fact and omitted other facts necessary to make the statements not

misleading, and failed to disclose material facts, as alleged herein.

48

139.     The Underwriter Defendants committed to and purchased AMAG's registered Common Stock from AMAG and sold the registered Common Stock to Lead Plaintiff and members of the Class by the use of means or instruments of transport or communication in interstate commerce or of the mails, by means of the Prospectus or oral or other written communications, including the Offering Documents.

140.     The Defendants named in this Count actively solicited the sale of the Common Stock to serve their own financial interests through, among other things, the preparation and dissemination of the Prospectus, participating in road shows, and the planning and orchestrating of all activities necessary to promote the sale of the Common Stock.

141.     The Prospectus and Offering Documents contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as alleged herein.

142.     The Defendants named in this Count knew or in the exercise of reasonable care should have known that the Prospectus and Offering Documents contained statements of material fact that were misleading as alleged herein or that material facts necessary to make the statements not misleading should have been disclosed, as alleged herein.  None of the Defendants made a reasonable investigation or had reasonable grounds to believe that the statements in the Prospectus were accurate and complete in all material respects.

143.     Lead Plaintiff and members of the Class purchased registered shares of AMAG Common Stock in the Offering and were damaged thereby.

144.     Lead Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of

material facts in the Prospectus, Offering Documents and other oral and written communications when they purchased or acquired the shares.

145.    This action is commenced within one year after the discovery of the misstatements and omissions contained in the Prospectus, Offering Documents and other oral and written communications and within three years of the Offering.

146.    By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and members of the Class for violations of Section 12(a)(2) of the Securities Act.  Lead Plaintiff and Class members hereby tender their registered shares of AMAG common stock to the Section 12 Defendants and seek rescission of their purchases to the extent that they continue to own such securities.  Lead Plaintiff and Class members who have sold their AMAG Common Stock are entitled to rescissory damages.

## COUNT III

**For Violations of Section 15 of the Securities Act for Control Person Liability
Based on Section 11 and 12(a)(2) Violations by AMAG Against Defendant Pereira and
Defendant Arkowitz**

147.    Lead Plaintiff repeats and realleges each and every allegation contained above.

148.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendants Pereira and Arkowitz on behalf of Lead Plaintiff and members of the Class who purchased or acquired registered shares of AMAG Common Stock pursuant to and/or traceable to the Offering Documents and were damaged by acts alleged therein.

149.    As alleged herein, Defendant AMAG violated Sections 11 and 12(a)(2) of the Securities Act by issuing the Offering Documents, which included materially untrue statements of fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  Defendants Pereira and Arkowitz were controlling persons of

Defendant AMAG when the Offering Documents were filed and became effective, due to their senior executive positions therewith; their direct involvement in the Company's day to day operations; and their participation in, and preparation of, the Offering Documents. Moreover, Defendant Pereira was a controlling person of Defendant Arkowitz when the Offering Documents were filed and became effective, due to his senior executive position as CEO and his direct supervision over Defendant Arkowitz in the preparation of the Offering Documents.

150.    By virtue of their exercise of control over the Company, these Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of AMAG, including the content of its public statements and of the Offering Documents. These Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

151.    This claim is brought within one year after the discovery of the materially untrue statements and omissions in the Offering Documents and within three years after AMAG's registered Common Stock was offered to the public.

152.    By reason of the misconduct alleged herein, Defendants Pereira and Arkowitz are liable to Lead Plaintiff and the members of the Class for violations of Section 15 of the Securities Act.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

(a)    Declaring this action to be a class action properly maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declaring Lead Plaintiff to be a proper Class representative;

(b)    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and all members of the Class against Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(d)    Awarding Lead Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## X.    **JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED:   December 17, 2010

By */s/ Mitchell M.Z. Twersky*
    Mitchell M.Z. Twersky (pro hac vice)
    Ximena R. Skovron (pro hac vice)
    **ABRAHAM, FRUCHTER &
    TWERSKY, LLP**
    One Penn Plaza, Suite 2805
    New York, New York 10119
    Tel: (212) 279-5050
    Fax: (212) 279-3655
    mtwersky@aftlaw.com
    xskovron@aftlaw.com

Ian D. Berg
**ABRAHAM, FRUCHTER &
TWERSKY, LLP**
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858)792-3448
Fax: (858)792-3449
iberg@aftlaw.com

*Lead Counsel for Plaintiffs*

Betsy Ehrenberg (BBO #554628)
**PYLE ROME EHRENBERG PC**
18 Tremont Street, Suite 500
Boston, MA 02108
Tel: 617-367-7200
Fax: 617-367-4820
behrenberg@pylerome.com

*Liaison Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Mitchell M.Z. Twerksy, Esq., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 17th day of December, 2010.


 /s/ *Mitchell M.Z. Twersky*
 Mitchell M.Z. Twersky