United States District Court
District of Massachusetts

| | |
|---|---|
| SILVERSTRAND INVESTMENTS, BRIARWOOD INVESTMENTS, INC. and SAFRON CAPITAL CORPORATION, Plaintiffs, v. AMAG PHARMACEUTICALS, INC., et al. Defendants. | Civil Action No. 10-10470-NMG |

**MEMORANDUM & ORDER**

**GORTON, J.**

This is a putative federal securities class action brought pursuant to the Securities Act of 1933 ("Securities Act") for alleged failures to disclose material information pertaining to a pharmaceutical drug. Before the Court are defendants' motions to dismiss the Second Amended Complaint and to strike certain exhibits submitted by plaintiffs.

## I. Factual Background

Lead plaintiffs Silverstrand Investments ("Silverstrand"), Safron Capital Corporation ("Safron") and Briarwood Investments, Inc. ("Briarwood") (collectively, "the plaintiffs") bring this federal securities class action on behalf of themselves and all purchasers of the common stock of AMAG Pharmaceuticals, Inc. ("AMAG") pursuant or traceable to SEC Form S-3/ASR, No. 333-164400, dated January 19, 2010 ("the Registration Statement") and

Prospectus dated January 21, 2010 ("the Prospectus") (collectively, "the Offering Documents") issued in connection with the secondary offering conducted on January 21, 2010 ("the Offering"). The Offering Documents incorporate by reference therein various other public filings, including several Forms 10-K, 10-Q and 8-K filed with the SEC in 2008 and 2009.

AMAG is a biopharmaceutical company incorporated in Delaware with its principal place of business in Massachusetts. Defendants Brian J.G. Pereira ("Pereira"), David A. Arkowitz ("Arkowitz"), Joseph V. Bonventre ("Bonventre"), Michael Narachi ("Narachi"), Robert J. Perez ("Perez"), Lesley Russell ("Russell"), Davey S. Scoon ("Scoon") and Ron Zwanziger ("Zwanziger") (collectively, "the individual defendants") are officers and/or directors of AMAG who signed the Registration Statement. Defendants Morgan Stanley & Co. Inc. ("Morgan Stanley"), J.P. Morgan Securities Inc. ("J.P. Morgan"), Goldman, Sachs & Co. ("Goldman"), Leerink Swann LLC ("Leerink"), Robert W. Baird Co. Inc. ("Robert Baird") and Canaccord Genuity Inc. ("Canaccord") (collectively, "the underwriter defendants") are various investment banks which provided underwriting services to AMAG for the Offering.

    **A.    The Development of Feraheme**

AMAG developed and commercialized Feraheme, an intravenous iron-replacement drug used to treat iron deficiency anemia in

adult patients with chronic kidney disease.  Feraheme, also known as ferumoxytol injection, is administered in a bolus (i.e. rapid) injection of 510 milligrams in as little as 17 seconds and a complete course of treatment can be accomplished in two to four physician visits.  By contrast, competing iron-replacement therapies Venofer and Ferrlecit must be administered as an intravenous infusion (i.e. "slow push") of 100 to 200 milligrams over a 15 to 60 minute interval and require five to ten physician visits.

In December, 2007, AMAG submitted a new drug application ("NDA") to the Food and Drug Administration ("FDA") seeking approval of Feraheme as an iron-replacement treatment.  After more than 20 NDA amendments by AMAG and two action letters dated October 17 and December 22, 2008, in which the FDA declined to approve Feraheme based, in part, on safety concerns, the FDA approved Feraheme for sale on June 30, 2009.  AMAG launched the drug in the United States in July, 2009.

The only other drug that AMAG currently sells is GastroMARK, an oral contrast agent used for delineating the bowel in magnetic resonance imaging ("MRI"), which received FDA approval in 1996.

**B.   The Offering**

On January 21, 2010, AMAG completed the Offering pursuant to the Offering Documents.  AMAG sold 3.6 million shares of its common stock to the public for a price of $48.25 per share,

resulting in net proceeds of approximately $174 million.  The Offering was a firm commitment secondary offering, meaning AMAG sold the shares to the underwriter defendants who then sold the shares to investors.  The underwriter defendants received $7.8 million in fees as a result of the Offering.

    **C.    Post-Offering Developments**

On February 4, 2010, an analyst report stated that there were "several patients hospitalized with anaphylactoid reactions to Feraheme [and] one death that may or may not be directly related to Feraheme."  The price of AMAG stock decreased from $45.25 per share to close at $38.12 per share that day.

On February 5, 2010, AMAG issued a safety update in a press release, disclosing that it had received reports of 40 serious adverse events ("SAEs") since the launch of Feraheme and the rate of SAEs was "reported at a rate consistent with that contained in the U.S. package insert."  AMAG's stock price declined from $38.12 per share to close at $37.77 per share that day.

On February 8, 2010, a follow-up analyst report 1) questioned the validity of comparing the 0.1% "per patient exposure" rate (i.e. 40 SAEs per 35,000 exposures) used by AMAG in its safety update with the 0.2% "per patient" rate (i.e. 3 SAEs per 1726 patients) used during clinical trials and 2) noted competitor Venofer had been associated with one SAE and one death in the ten years since it was introduced to the market.  The

price of AMAG's stock fell from $37.77 per share to close at $36.67 per share that day.

In total, AMAG's stock price declined 24% from $48.25 per share at the Offering on January 21, 2010 to close at $36.67 per share on February 8, 2010.

### D. Post-Suit Developments

In August, 2010, the FDA created a Tracked Safety Issue ("TSI") for Feraheme. On October 18, 2010, the FDA issued a Warning Letter to AMAG finding that it had misbranded Feraheme in violation of the Food, Drug and Cosmetic Act, 21 U.S.C. § 352(a), (f)(1) and (n), as well as various FDA regulations and stating that AMAG had failed:

> to communicate any of the risks associated with the drugs [and thus] the webpages misleadingly suggest that GastroMARK and Feraheme are safer than has been demonstrated and therefore place the public at risk.

Shortly thereafter, AMAG held a conference call with analysts to discuss the recent developments. On October 29, 2010, the following day, AMAG's stock price fell from $19.30 per share to close at $15.91 per share.

On November 26, 2010, after AMAG announced changes in the product insert (i.e. label) for Feraheme, its stock closed at $14.05 per share. The new label included warnings that post-marketing SAEs had occurred and required an increase in the observation period in patients after use of Feraheme.

In total, AMAG's stock price declined 71% from $48.25 per

share at the Offering on January 21, 2010 to close at $14.05 per share on November 26, 2010.

**E.    The Alleged Material Omissions**

The crux of the prolix Second Amended Complaint is that the Offering Documents omitted material facts, including facts necessary to make the statements therein not misleading, as a result of which plaintiffs purchased securities whose true value was less than their purchase price.  Although plaintiffs plead a barrage of alleged material omissions, their laundry list boils down to three:

1)    Although the Offering Documents stated that there was a risk of development of SAEs, they failed to disclose that, as of the date of the Offering, AMAG had reported 23 post-marketing SAEs associated with Feraheme to the FDA.  Those 23 SAEs allegedly established a clear and significant pattern and were likely to affect the safety profile and commercial viability of Feraheme.

2)    The Offering Documents failed to disclose that the FDA had twice declined to approve Feraheme because of safety concerns, including one case of anaphylaxis.  Because the SAEs were of concern to the FDA in its approval process, post-marketing SAEs raised the risk that Feraheme would be adversely impacted, such as by being removed from the market or having stricter label warnings imposed.

3) The Offering Documents failed to disclose that a portion of AMAG's revenue was derived from "the illegal and misleading marketing practices" identified by the FDA in its Warning Letter.

## II. Procedural History

In March, 2010, plaintiffs filed a class action complaint seeking relief under Section 11 of the Securities Act, 15 U.S.C. § 77k. Following their appointment as lead plaintiffs in July, 2010, Silverstrand, Safron and Briarwood filed an amended complaint which named additional defendants and asserted two new causes of action under Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(2) and 77o.

On December 17, 2010, plaintiffs filed a second amended complaint pursuant to a stipulation entered into by the parties under Fed. R. Civ. P. 15(a)(2). The Second Amended Complaint alleges violations of § 11 against all defendants (Count I), § 12(a)(2) against defendants AMAG, Pereira, Arkowitz and the underwriter defendants (Count II) and § 15 against Pereira and Arkowitz (Count III).

In February, 2011, after an unopposed extension of time, the individual defendants and the underwriter defendants filed motions to dismiss the Second Amended Complaint which plaintiffs timely opposed in an omnibus motion. The individual defendants also moved to strike certain exhibits submitted by plaintiffs in

its opposition which plaintiffs timely opposed.

Pending before the Court are defendants' motions to dismiss and to strike certain of plaintiffs' exhibits.

### III. Analysis

#### A. Legal Standard

In order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. Nollet v. Justices of the Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. See Nollet, 83 F. Supp. 2d at 208.

Although the Court must accept as true all of the factual allegations contained in a complaint, that doctrine is not,

however, applicable to legal conclusions.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Threadbare recitals of the legal elements, supported by mere conclusory statements, do not suffice to state a cause of action.  Id.  Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of any more than the mere possibility of misconduct.  Id. at 1950.

**B. Application**

As an initial matter, defendants contend plaintiffs' claims "sound in fraud" and thus are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  See Cooperman, 171 F.3d at 47 n.6 (noting Rule 9(b) does not apply to claims that do not "sound in fraud"); In re Sonus Networks, Inc. Sec. Litig., 2006 WL 1308165, *6 (D. Mass. May 10, 2006).  Because, however, defendants frame their arguments primarily with respect to Fed. R. Civ. P. 8 and plaintiffs' Second Amended Complaint fails to state a claim even under that standard, the Court need not determine whether Rule 9(b) applies.

**1. Motion to Strike**

Defendants move to strike two exhibits submitted by plaintiffs with their opposition: minutes from a September 23, 2010, meeting between AMAG representatives and the FDA (Exhibit 2) ("FDA Meeting Minutes") and a letter dated January 31, 2011, from the FDA to plaintiffs in response to their Freedom of

Information Act ("FOIA") request (Exhibit 3) ("FOIA Letter"). Defendants contend the FDA Meeting Minutes should be stricken because, inter alia, they were not referenced in the Second Amended Complaint and are not "freely available" to the public. Plaintiffs assert the documents were unavailable at the time the Second Amended Complaint was filed and urge the Court to take judicial notice of their existence but not the truth of their contents or, in the alternative, to give them leave to amend the Second Amended Complaint.

Pursuant to Fed. R. Evid. 201, the Court may take judicial notice of a fact "not subject to reasonable dispute." Here, the Court takes judicial notice of the existence of the FDA Meeting Minutes and accompanying FOIA Letter but not the truth of the contents therein. See McGuire v. Dendreon Corp., 2008 WL 1791381, *4 (W.D. Wash. Apr. 18, 2008) (taking judicial notice of documents but declining to draw any inferences therefrom); see also Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (upholding taking of judicial notice of FDA letter and transcripts); In re Vertex Pharms. Inc. Sec. Litig., 357 F. Supp. 2d 343, 351 n.4 (D. Mass. 2005) (taking judicial notice of public record); Peviani v. Hostess Brands, Inc., 750 F. Supp. 2d 1111, 1116 (C.D. Cal. 2010) (taking judicial notice of FDA Food Labeling Guide and listing cases). Moreover, notice to either party is not a concern here. See Watterson v. Page, 987 F.2d 1,

3-4 (1st Cir. 1993) (explaining that when court reviews statements extraneous to complaint, concern is generally lack of notice). The Court will, therefore, deny defendants' motion to strike.

### 2. Section 11 of the Securities Act (Count I)

Count I of the Second Amended Complaint alleges violations of § 11 against all defendants. The Second Amended Complaint alleges only that defendants omitted to state material facts or, in the alternative, that they omitted material facts necessary to make the statements in the Offering Documents not misleading.

Section 11 imposes liability on the issuer of a security, as well as any person who signed the registration statement and/or served as a director or performed similar functions, if the registration statement 1) contained an untrue statement of material fact, 2) omitted to state a material fact or 3) omitted a material fact necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a); see Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1201 (1st Cir. 1996), superseded on other grounds by statute, Private Securities Litigation Reform Act of 1995; In re Evergreen Ultra Short Opportunities Fund Sec. Litig., 705 F. Supp. 2d 86, 91 (D. Mass. 2010). Thus, to avoid dismissal of their § 11 claim, plaintiffs must successfully allege that: 1) AMAG's Offering Documents contained an omission, 2) the omission was material, 3) defendants were under a duty to disclose the

omitted information and 4) such omitted information existed at the time the Offering Documents became effective. See, e.g., Cooperman v. Individual, Inc., 171 F.3d 43, 47 (1st Cir. 1999).

Unlike § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), § 11 has no scienter or reliance requirement. Evergreen, 705 F. Supp. 2d at 91. As long as the plaintiff can prove a material misstatement or omission, § 11 liability for the issuer of the security is "virtually absolute, even for innocent misstatements." Herman v. Huddleston, 459 U.S. 375, 381-82 (1983). Thus, to establish a prima facie violation of § 11, a plaintiff need only show a material misstatement or omission. Sonus, 2006 WL 1308165 at *11.

The same standard of materiality applies, however, to § 11 and § 12 claims as to § 10(b) claims. Shaw, 82 F.3d at 1217. A fact is material if its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Moreover, the "mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement." Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994).

Even a material omission is not, however, necessarily actionable. In re Pharm., Inc. Sec. Litig., 2007 WL 951695 at *3

(D. Mass. March 28, 2007). There must also be a duty to disclose. Garvey v. Arkoosh, 453 F. Supp. 2d 73, 80-81 (D. Mass. 2005); see also Backman v. Polaroid Corp., 910 F.2d 10, 13 (1st Cir. 1990) (noting silence, absent a duty to disclose, is not misleading); Pharm., Inc., 2007 WL 951695 at *3 ("Absent a legal duty to disclose, there is no liability for simple non-disclosure."). A duty to disclose may be triggered by, inter alia, a statute or regulation or when a company has made inaccurate, incomplete or misleading prior disclosures. Garvey, 453 F. Supp. 2d at 81 n.10. In addition, if a corporation does make a disclosure, whether voluntary or required, there is a duty to make it complete and accurate. Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987).

The Court considers each of plaintiffs' nondisclosure allegations in turn.

### a. The 23 SAEs

Plaintiffs' predominant allegation is that, pursuant to SEC Regulation S-K Items 303(a)(3)(ii) and 503(c), defendants were required but failed to disclose 23 post-marketing SAEs associated with Feraheme which AMAG had reported to the FDA prior to the Offering.

There is "a strong affirmative duty of disclosure in the context of a public offering." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (citing Shaw, 82 F.3d at 1202).

-13-

It is clear, however, that there is "no absolute duty to disclose all material information." Cooperman, 171 F.3d at 49; see also Hill v. Gozani, 2011 WL 2566142, *1 (1st Cir. May 26, 2011) (noting possession of material, non-public information does not create an automatic duty to disclose). The question is whether the securities law imposes a specific obligation to disclose the specific kind of information allegedly omitted. Cooperman, 171 F.3d at 50.

Regulation S-K governs the disclosure requirements of registration statements, periodic reports and annual reports filed with the SEC. 17 C.F.R. § 229.10. Item 303(a)(3)(ii) of that regulation requires the disclosure of, inter alia:

> any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

17 C.F.R. § 229.303(a)(3)(ii). That language has been interpreted as referring to "those trends discernible from hard information alone." Glassman, 90 F.3d at 631. In other words, "Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus." Kapps v. Torch Offshore, Inc., 379 F.3d 207, 218 (5th Cir. 2004) (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1191-92 (11th Cir. 2002)). A breach of the duty

-14-

to disclose under Item 303 may be actionable under § 11. See In re Thornburg Mortg., Inc. Sec. Litig., 2011 WL 2429189, *28, *34 (D.N.M. June 2, 2001) (listing cases).

Turning its attention to Item 303(a)(3)(ii), the Court finds no actionable omission even though AMAG knew of the 23 SAEs at the time of the Offering. The mere existence of reports of SAEs is insufficient and indeed, "something more is needed." See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011). Even if the Court assumes that the 23 SAEs are material, however, plaintiffs' claim still is deficient because the 23 SAEs do not amount to a "known trend or uncertainty" and thus need not be disclosed.

AMAG repeatedly disclosed in its Offering Documents and other public filings the safety information for Feraheme, including the fact that SAEs were observed during the clinical trials. See, e.g., Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1193 (11th Cir. 2002) (holding prospectus not misleading because warnings included risk of relevant side effect). Specifically, the Prospectus warned about risks, including "the development of unanticipated adverse reactions to Feraheme resulting in safety concerns among prescribers." In addition, the 23 SAEs that occurred after the launch of Feraheme but prior to the Offering were consistent with the previously and publicly-disclosed rates observed in the clinical trial. Thus, the 23

SAEs did not constitute a known trend that would have a material unfavorable impact on sales, revenue or income.  Plaintiffs emphasize in rebuttal that a death occurred post-marketing, pre-Offering but one death does not a trend make.

Item 503 of Regulation S-K requires an issuer to include "a discussion of the most significant risk factors that make the offering risky or speculative."  17 C.F.R. § 229.503.  Plaintiffs contend that the 23 SAEs constituted a significant factor that made the Offering risky or speculative and thus should have been disclosed.  The Offering Documents, however, contained extensive disclosures of the risks associated with Feraheme, including data from the clinical trials and how SAEs could impact Feraheme's success.  Based on those disclosures and for substantially the same reasons that plaintiffs' claim with respect to Item 303(a)(3)(ii) is wanting, their claim as to Item 503 also fails.

### b. The FDA Action Letters

Plaintiffs further allege that the Offering Documents failed to disclose that the FDA had twice declined to approve Feraheme due to safety concerns, citing a "clinical pattern of serious adverse reactions."

That argument is unavailing, however, because the FDA's subsequent approval of the NDA prior to the Offering indicates any concerns raised previously in the letters had been resolved. See, e.g., In re Alkermes Sec. Litig., 2005 WL 2848341, *16 (D.

Mass. Oct. 6, 2005) (holding FDA's eventual approval meant defendants had remedied whatever problem existed); In re Syntex Corp. Sec. Litig., 95 F.3d 922, 930-31 (9th Cir. 1996) (explaining FDA's approval indicates company remedied any defects and thus statements were not false or materially misleading). Moreover, the defendants had no duty to disclose because both action letters had already been publicly disclosed by the FDA prior to the Offering. See, e.g., In re Progress Energy, Inc., 371 F. Supp. 2d 548, 552-53 (S.D.N.Y.2005) ("It is well-established law that the securities laws do not require disclosure of information that is publicly known.").

### c. The FDA Warning Letter

Plaintiffs allege the Offering Documents failed to disclose that AMAG derived revenue from "the illegal and misleading marketing practices" identified by the FDA in a Warning Letter dated October 18, 2010.

That argument is unpersuasive because § 11 imposes liability only if the registration statement contains material misstatements or omissions as of its effective date. Shaw, 82 F.3d at 1204; see Zucker v. Quasha, 891 F. Supp. 1010, 1017 (D.N.J. 1995) (stating that even § 11 "does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants"). Indeed, the Court "may not employ 20/20 hindsight" but rather must

consider whether the omission was material on the date the Offering Documents were issued. See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008). The Second Amended Complaint fails to establish any connection between the Warning Letter or the allegations contained therein and the time of the Offering. See Zucker, 891 F. Supp. at 1017 ("In order to prevail, a plaintiff must show that the omitted information in fact existed at the time that the allegedly misleading statement was made.").

Count I will, therefore, be dismissed.

### 3. Section 12 of the Securities Act (Count II)

Count II alleges violations of § 12(a)(2) against defendants AMAG, Pereira, Arkowitz and the underwriter defendants. Section 12(a)(2) of the Securities Act imposes liability on any person who "offers or sells" a security by means of a prospectus or oral communication that contains an untrue statement of material fact or a misleading omission. 15 U.S.C. § 77l(a)(2). For the same reasons that plaintiffs' § 11 claim fails, the § 12(a)(2) claim is also unsuccessful. See In re Barclays Bank PKC Sec. Litig., 2011 WL 31548, *5 (S.D.N.Y. Jan. 5, 2011) ("Sections 11 and 12(a)(2) are Securities Act siblings with roughly parallel elements."). Count II will, therefore, be dismissed and the Court need not reach the issue of standing raised in the underwriter defendants' motion to dismiss.

### 4. Section 15 of the Securities Act (Count III)

Count III alleges violations of § 15 for control person liability based on violations of § 11 and § 12(a)(2) by AMAG against defendants Pereira and Arkowitz. Section 15 of the Securities Act provides for joint and several liability for persons who control any person liable under § 11 or § 12 of the Securities Act. 15 U.S.C. § 77o. In order for "control person" liability under § 15 to attach, the plaintiffs must allege 1) an underlying violation by the controlled person or entity and 2) that the defendants controlled the violator. Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002). Because plaintiffs have failed to state a claim for a primary violation of either § 11 or § 12(a)(2), they have also fallen short of stating a claim under § 15. See, e.g., Cooperman, 171 F.3d at 52. Count III will, therefore, be dismissed.

### ORDER

In accordance with the foregoing,

1) motion to strike (Docket No. 55) is **DENIED;**

2) motion to dismiss (Docket No. 42) is **ALLOWED;** and

3) underwriter defendants' motion to dismiss (Docket No. 44) is **ALLOWED.**

**So ordered.**

                               /s/ Nathaniel M. Gorton  
                               Nathaniel M. Gorton  
                               United States District Judge  
Dated August 11, 2011