**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| SILVERSTRAND INVESTMENTS, | ) |
| BRIARWOOD INVESTMENTS, INC. and | ) |
| SAFRON CAPITAL CORPORATION, | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. |
| | ) 10-10470-NMG |
| v. | ) |
| | ) |
| AMAG PHARMACEUTICALS, INC., et | ) |
| al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM & ORDER**

GORTON, J.

This complex case concerns the alleged failure of a
pharmaceutical company, AMAG Pharmaceuticals, Inc. ("AMAG"), to
disclose material defects pertaining to its pharmaceutical drug,
Feraheme, prior to a public offering of its stock.  Based on
that alleged failure to disclose, a group of investment firms
(collectively, "plaintiffs") brought suit under §§ 11, 12 and 15
of the Securities Act of 1933 ("Securities Act").

During the clinical stages of the drug approval process of
the Food and Drug Administration ("FDA"), pharmaceutical
companies provide the FDA with detailed reports of patient
reactions.  Severe Adverse Events ("SAEs") are one kind of
reaction that must be reported to the FDA.  They include
reactions caused by the drug ("drug-related"), those in which

the drugs are a factor ("drug-associated") and those which may be entirely unrelated to use of the drug. SAEs are generally communicated to the FDA in new drug applications ("NDAs") but must also be described in various forms submitted to the Securities and Exchange Commission ("SEC") prior to an offering of stock, including the registration statement, the prospectus and required public filings such as 10-Ks, 10-Qs and 8-Ks.

Plaintiffs purchased AMAG stock as part of a secondary offering conducted on January 21, 2010 ("the Offering"). They allege that between FDA approval of the drug Feraheme in 2009 and the Offering in 2010, AMAG was made aware of 23 SAEs but failed to report them in their offering documents in order to protect Feraheme's safety profile by deceiving investors, patients and doctors. Shortly after the Offering, an independent analyst uncovered the 23 SAEs and inquired about them publicly. Other analysts became aware of the story and the FDA took notice. Over the next few months, AMAG's stock decreased 71% from $48.25 per share on January 21, 2010, to $14.05 per share on November 26, 2010. In March, 2010, Plaintiffs filed suit against AMAG, several of its officers and directors and several firms that provided underwriting services in connection with the Offering (collectively, "defendants").

In August, 2011, this Court allowed defendants' motion to dismiss all three counts for failure to state claims after

-2-

applying the standard of Fed. R. Civ. P. 8(a).  Plaintiffs

appealed to the First Circuit Court of Appeals which, in

February, 2013, affirmed, in part, and reversed, in part,

remanding the case for further proceedings.  The First Circuit

determined that under the Rule 8(a) standard the 23 SAEs were

actionable omissions, while other alleged omissions were not.

On remand, however, the First Circuit left it to this Court to

decide whether (1) Rule 8(a) or Rule 9(b) governs the

appropriate standard of review and (2) whether defendants meet

the statutory definition of "seller" or "solicitor" under

§ 12(a)(2) of the Securities Act.

Pending before the Court are the renewed motions to dismiss

the Second Amended Complaint ("SAC") by AMAG and its officers

and directors ("the AMAG defendants") and by the firms offering

underwriting services ("the underwriter defendants").  For the

reasons that follow, the Court will deny the motions to dismiss.[1]

I.   **Factual Background**

Plaintiffs bring this federal securities class action on

behalf of themselves and all purchasers of the common stock of

AMAG pursuant or traceable to SEC Form S-3/ASR, No. 333-164400,

dated January 19, 2010 ("the Registration Statement") and the

Prospectus dated January 21, 2010 ("the Prospectus")

---

[1] Plaintiffs filed a motion for leave to file a sur-reply (Docket
No. 106) which the Court will deny as moot.

(collectively, "the Offering Documents") issued in connection with the Offering.  The Offering Documents incorporate by reference various other public filings, including several Forms 10-K, 10-Q and 8-K filed with the SEC in 2008 and 2009.

**A.    The Parties**

Plaintiffs Silverstrand Investments ("Silverstrand"), Briarwood Investments, Inc. ("Briarwood") and Safron Capital Corporation ("Safron") are investment advisor firms that purchased AMAG stock issued in connection with the Offering.

Defendant AMAG is a biopharmaceutical company incorporated in Delaware with its principal place of business in Massachusetts.  The individually named defendants are directors and officers of AMAG who signed the Registration Statement, including AMAG's President and Chief Executive Officer Brian J.G. Pereira ("Pereira") and AMAG's Chief Financial Officer David A. Arkowitz ("Arkowitz").  The SAC also names the six AMAG directors who signed the Registration Statement: Joseph V. Vonventre, Michael Narachi, Robert J. Perez, Lesley Russell, Davey S. Scoon and Ron Zwanziger (collectively, "the directors").  Underwriter defendants are various investment banks that provided underwriting services to AMAG for the Offering.

**B.   The Development of Feraheme**

AMAG developed and commercialized Feraheme, an intravenous drug used to treat iron deficiency anemia in adult patients with chronic kidney disease.  Also known as ferumoxytol injection, Feraheme is administered by an injection of 510 milligrams in as little as 17 seconds and a complete course of treatment can be accomplished in two to four physician visits.  The FDA approved Feraheme for sale in June, 2009.  AMAG launched the drug in the United States the following month.

Between 2009 and January 21, 2010 (the date of the Offering), AMAG informed the FDA of 23 SAEs which it did not report in its Offering Documents.  At least 16 of the SAEs included hospitalizations and one SAE resulted in the death of a patient.

**C.   The Offering**

On January 21, 2010, AMAG sold 3.6 million shares of its common stock to the public for a price of $48.25 per share, resulting in net proceeds of approximately $174 million.  The Offering was a firm commitment secondary offering, meaning AMAG sold the shares to the underwriter defendants who then sold the shares to investors.  The underwriter defendants received $7.8 million in fees as a result of the Offering.

### 1. Post-Offering Developments

Three post-offering developments caused AMAG's stock price to decline by 24% from $48.25 per share at the Offering on January 21, 2010, to $36.67 per share on February 8, 2010.

First, on February 4, 2010, an analyst report, referring to the undisclosed SAEs, stated that several patients had been "hospitalized with anaphylactoid reactions to Feraheme" and that one patient died in an incident "that may or may not be directly related to Feraheme."

Second, on February 5, 2010, AMAG issued a safety update in a press release, disclosing that it had received reports of 40 serious adverse events ("SAEs") since the launch of Feraheme and the rate of SAEs was "reported at a rate consistent with that contained in the U.S. package insert." AMAG noted that the rate was approximately 0.1% "per patient exposure."

Third, on February 8, 2010, a follow-up analyst report (1) questioned the validity of comparing the 0.1% "per patient exposure" rate (i.e. 40 SAEs per 35,000 exposures) used by AMAG in its safety update with the 0.2% "per patient" rate (i.e. 3 SAEs per 1726 patients) used during clinical trials and (2) noted that AMAG's competitor Venofer had been associated with only one SAE and one death in the ten years since it was introduced to the market.

## 2.   Post-Complaint Developments

In August, 2010, the FDA created a Tracked Safety Issue ("TSI") for Feraheme in light of the cardiac-related SAEs.  TSIs are opened when FDA staff assigned to the Center for Drug Evaluation and Research ("CDER") identify a potential signal of a serious risk in the Adverse Event Reporting System ("AERS"). CDER staff members then inform the sponsor of the drug and include the TSI in a required quarterly report.  Because the information is shared with the sponsor and the public at such an early stage in the FDA's evaluation of the potential issue, the FDA is usually unable to determine or communicate what kind of regulatory action, if any, is appropriate at the time.

On October 18, 2010, the FDA issued a Warning Letter to AMAG, finding that it had misbranded Feraheme in violation of the Food, Drug and Cosmetic Act, 21 U.S.C. § 352(a),(f)(1) & (n), as well as various FDA regulations.

On October 29, 2010, AMAG's stock price fell from $19.30 per share to close at $15.91 per share.  On November 26, 2010, after AMAG announced changes in Feraheme's product label, AMAG's stock price closed at $14.05 per share.  In total, AMAG's stock price declined 71% between the time of the Offering on January 21, 2010, and the announcement on November 26, 2010.

II.  **The Securities Act**

  A.  **Items 303 and 503 of SEC Regulation S-K**

  Regulation S-K governs the disclosure requirements of registration statements, periodic reports and annual reports filed with the SEC. 17 C.F.R. § 229.10.  The registration statement, here a Form S-3, is divided into "items" which require the issuer to disclose basic business and financial information.

  Item 303 requires the disclosure of any known trend or uncertainty that the registrant reasonably expects to have a material, unfavorable impact on net sales, revenues or income. 17 C.F.R. § 229.303(a)(3)(ii).  Such disclosures give investors the ability to assess the current financial condition of the registrant as well as its future prospects. Certain Inv. Co. Disclosures, SEC Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

  To plausibly plead a "failure to disclose" claim with respect to Item 303, a complaint must allege that (1) the registrant knew about an uncertainty before an offering, (2) the known uncertainty is reasonably likely to have material effects on the registrant's financial condition or results of operation and (3) the offering documents failed to disclose the known uncertainty. See id. at *4.

Item 503 requires that a prospectus include "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).  The aim of the discussion is to provide the investor with a "clear and concise summary of the material risks" of investing in the issuer's securities. Securities Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004).  The discussion must describe the most significant factors that may adversely affect the issuer's business or its future financial performance and should go beyond generic or boilerplate discussions to explain specifically how the risk affects the securities being offered. See In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 691 (S.D.N.Y. 2004).

A complaint alleging omissions of Item 503 risks needs to allege sufficient facts to infer that a registrant knew, as of the time of the offering that (1) a risk factor existed, (2) the risk factor could adversely affect the registrant's present or future business expectations and (3) the offering documents failed to disclose the risk factor. See 17 C.F.R. 229.503(c).

**B.  Section 11 of the Securities Act**

Section 11 is an "enforcement mechanism[] for the mandatory disclosure requirements of the Securities Act." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1201 (1st. Cir.

1996), abrogated in part on other grounds by 15 U.S.C. § 78u-
4(b)).  It imposes liability on the issuer of a security, as
well as any person who signs the registration statement or
serves as a director, if the registration statement (1) contains
an untrue statement of material fact, (2) omits a material fact
required to be included or (3) omits a material fact necessary
to make the statements therein not misleading. 15 U.S.C. §
77k(a).  Actionable omissions under § 11 include when a
registration statement fails to comply with regulations
requiring disclosure, including Items 303 or 503. See Shaw v.
Digital Equip. Corp., 82 F.3d 1194, 1202 n.3 (1st Cir. 1996).

Section 11 differs from § 10(b) of the Securities Exchange
Act of 1934 ("Exchange Act") because § 11 does not include a
scienter or reliance requirement and neither the heightened
pleading standard of Fed. R. Civ. P. 9(b) nor the Private
Securities Litigation Reform Act applies unless a § 11 claim
sounds in fraud. See In re Morgan Stanley Info. Fund Sec.
Litig., 592 F.3d 347, 359 (2d Cir. 2010).  Thus, the provision
places a minimal burden on a plaintiff who ordinarily need only
satisfy the notice pleading standard of Rule 8(a). Panther
Partners, Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d
Cir. 2012).

The same standard of materiality pertains, however, to both § 11 claims and § 10(b) claims. <u>Shaw</u>, 82 F.3d at 1217. A fact is material if its disclosure

> would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

<u>Basic Inc.</u> v. <u>Levinson</u>, 485 U.S. 224, 231-32 (1988) (quoting <u>TSC Indus., Inc.</u> v. <u>Northway, Inc.</u>, 426 U.S. 438, 449 (1976)).

> The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement.

<u>Lucia</u> v. <u>Prospect St. High Income Portfolio, Inc.</u>, 36 F.3d 170, 175 (1st Cir. 1994) (quoting <u>Milton</u> v. <u>Van Dorn Co.</u>, 961 F.2d 965, 969 (1st. Cir. 1992)).

A material omission must also be subject to a duty to disclose in order to be actionable. <u>Garvey</u> v. <u>Arkoosh</u>, 354 F. Supp. 2d 73, 80-81 (D. Mass. 2005). The mere existence of reports of severe adverse events, however, does not create such a duty. <u>Matrixx Initiatives, Inc.</u> v. <u>Siracusano</u>, 131 S. Ct. 1309, 1321 (2011). "Something more is needed" but it need not be statistically significant data; context can demonstrate that SAEs should have been disclosed "as material even though the reports did not provide statistically significant evidence of a causal link." <u>Id.</u> A duty to disclose may be triggered by, <u>inter alia</u>, a statute or regulation or when a company has made inaccurate, incomplete or misleading prior disclosures. <u>Garvey</u>,

-11-

354 F. Supp. 2d at 81 n.10.  In addition, when a corporation

makes a voluntary or required disclosure, a duty arises to make

it complete and accurate. <u>Roeder</u> v. <u>Alpha Indus., Inc.</u>, 814 F.2d

22, 26 (1st Cir. 1987).

**C.  Section 12(a)(2) of the Securities Act**

Section 12 imposes liability on any person who "offers or

sells" a security by means of a prospectus or oral communication

that contains an untrue statement of material fact or a

misleading omission. 15 U.S.C. § 77$l$(a)(2).  To state a claim

under § 12(a)(2), a plaintiff must adequately allege: (1) that

each defendant was a "seller" of the securities sold in the

Offering, (2) the prospectus contained a misstatement of fact or

failed to state a fact necessary to make a statement not

misleading and (3) the false or misleading statement was

material. <u>Id.</u>  In <u>Shaw</u>, the First Circuit held that, in a firm-

commitment underwriting (where, as here, the issuer sells its

stock to underwriters) the company is not a statutory seller and

will only be held liable if it actively "solicited" the

Plaintiff's purchases "in the manner of a broker or vendor's

agent." <u>Shaw</u>, 82 F.3d at 1215-16.

**D.  Section 15 of the Securities Act**

Section 15 provides for joint and several liability for

persons who "control" or "aid and abet" a party liable under

Sections 11 or 12(a)(2). 15 U.S.C. § 77o.  Thus, § 15 requires

-12-

that plaintiffs first prove a primary violation of either § 11
or § 12(a)(2).  In order to attach "control person" liability
under § 15, a plaintiff must allege (1) an underlying violation
by the controlled person or entity and (2) that the defendants
controlled the violator. <u>Aldridge</u> v. <u>A.T. Cross Corp.</u>, 284 F.3d
72, 85 (1st Cir. 2002).

## III.  <u>Procedural History</u>

### A.  The Second Amended Complaint

On December 17, 2010, plaintiffs filed the Second Amended
Complaint ("SAC").  The SAC alleged violations of § 11 against
all defendants (Count I), violations of § 12(a)(2) against the
AMAG, Pereira, Arkowitz and the underwriter defendants (Count
II) and violations of § 15 against Pereira and Arkowitz (Count
III) for omitting material facts, including facts necessary to
make the statements therein not misleading.

Although plaintiffs pled a multitude of alleged material
omissions, they focused on two omissions by AMAG pursuant to
Items 303 and 503 of the Regulation S-K: (1) failure to disclose
23 reports of SAEs (including a death) linked to Feraheme and
(2) failure to disclose information the FDA revealed in a
Warning Letter issued nine months after the Offering.

### B.  Defendant's Original Motion to Dismiss

On August 11, 2011 this Court entered a Memorandum and
Order allowing defendants' motions to dismiss the SAC.

### 1. Legal Standard

In considering the merits of defendants' original motion to
dismiss, this Court applied Fed. R. Civ. P. 8(a).  To survive a
motion to dismiss under that standard, a complaint must contain
factual allegations sufficient "to raise a right to relief above
the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S.
544, 555 (2007).  At the Rule 8 stage, a court accepts the
allegations in the complaint as true and draws all reasonable
inferences in the plaintiff's favor but threadbare recitals of
the legal elements and conclusory statements are insufficient in
that regard. Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).

### 2. Application

Applying Rule 8(a), the Court allowed defendants' motion to
dismiss on all three counts.  The Court considered the
plaintiffs' nondisclosure claim under § 11 in three categories:
(1) the 23 SAEs, (2) the FDA Action Letters and (3) the FDA
Warning Letter.  The Court found no liability from the 23 SAEs
because they were of the same nature and occurred at the same
rate as previously disclosed reaction rates observed in the
clinical trials.  AMAG had previously disclosed in its Offering
Documents that the SAE rates per patient were approximately
0.17%, a rate with which the subsequent SAEs comported.  This
Court determined that the SAEs, notwithstanding the presence of
one death, did not constitute a "known trend that would have a

-14-

material unfavorable impact on sales, revenue or income."
Silverstrand Invs. v. AMAG Pharm., Inc. ("Silverstrand I"), No.
10-10470-NMG, 2011 WL 3566990, at *6 (D. Mass. Aug. 11, 2011).

With respect to the FDA Action Letters, the Court found
that they were immaterial because the FDA had subsequently
approved AMAG's NDA prior to the Offering.  Finally, as to the
FDA Warning Letter, the Court found no liability because it came
after the effective date of the registration statement.  The
Court thus determined that none of the three categories was
actionable through Item 303 or Item 503 and dismissed Count I.

The Court then considered the § 12 claim, determining for
similar reasons that none of the nondisclosures was actionable
under § 12(a)(2). See In re Barclays Bank PKC Sec. Litig., No.
09-cv-1989, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011)
("Sections 11 and 12(a)(2) are Securities Act siblings with
roughly parallel elements.").  Count II was dismissed and the
Court did not reach the issue of standing (i.e. whether
defendants fit the statutory definition of "offeror or seller").

Finally, the Court dismissed without analysis the § 15
claim of control because a primary violation under § 11 or §
12(a)(2) is required for liability to attach under § 15.

## C.  First Circuit Reversal and Remand

Plaintiffs filed an appeal with the First Circuit Court of
Appeals.  In February, 2013, the First Circuit issued an opinion

-15-

affirming, in part, and reversing, in part, this Court's

dismissal of plaintiffs' claims.  It remanded the case for

further proceedings.

### 1.   Section 11 Claims

The First Circuit held that the relevant allegations for

its analysis were the following:

> (1) that as of the time of the Offering, Feraheme had
> been in the market for six months; (2) that Feraheme
> was sold in a market dominated by well-known
> alternatives with proven safety and efficacy records;
> (3) that AMAG's profitability entirely depended on
> Feraheme's commercial success; (4) that the FDA twice
> declined to approve Feraheme due to safety concerns,
> which included one incident of anaphylaxis; (5) that
> during Feraheme's clinical trials "there were no
> deaths determined by the [FDA] investigators to be
> drug-related"; (6) that as of the time of the
> Offering, AMAG had disclosed to the FDA 23 SAEs,
> including one death in which Feraheme had been
> identified by a reporting physician as the "Primary
> Suspect," two incidents of "life-threatening"
> anaphylactic reactions attributed to Feraheme, and
> fourteen hospitalizations caused by anaphylactic
> symptoms attributed to Ferahame; and (7) that AMAG's
> Offering Documents did not disclose either the death,
> the "life-threatening" incidents, or the fourteen
> hospitalizations attributed to Feraheme.

Silverstrand Invs. v. AMAG Pharm., Inc. ("Silverstrand II"), 707

F.3d 95, 103 (1st Cir. 2013).

Taking those seven allegations of fact as true and applying

the Rule 8(a) standard, the First Circuit had "no trouble

drawing the reasonable inference" that before the Offering, AMAG

knew (1) that the death, two life-threatening reactions and 14

hospitalizations would have been "relevant to consumers" when

deciding whether to use Feraheme instead of an alternative; (2) that the 23 SAEs could have led to FDA action and (3) that FDA intervention due to the 23 SAEs would have meant "trouble" for AMAG. Id. at 103-04.

Notably, the First Circuit disagreed with this Court's assessment of the statistical evidence at hand. Whereas this Court found dispositive that the 23 SAEs "were consistent with" problems that arose during Feraheme's clinical trials, the First Circuit underscored that the complaint alleges that the "true" rate of post-marketing SAEs is as high as 0.45% per patient, "over two times higher than what AMAG had previously reported." Id. at 105. Moreover, the First Circuit noted that its "analysis under Items 303 and 503 cannot be limited to simple arithmetical computations." Id. Indeed, the court acknowledged that

> even if [defendants' statistical comparison] worked in their favor, [it] is not dispositive. Rather, at this stage, we are more concerned with the allegation that, when the Offering took place, the news that Feraheme had possibly caused a death, as well as the other serious side effects reported in the 23 SAEs, was already circulating within the medical community AMAG needed to win over to remain as a going concern.

Id. at 106.

The First Circuit concluded that the SAC plausibly pled claims of actionable omissions under § 11 because the 23 SAEs gave rise to (1) uncertainties AMAG reasonably knew would

-17-

adversely affect future revenues (Item 303) and (2) risk factors
that made the Offering risky and speculative (Item 503).
Accordingly, the First Circuit reversed this Court's dismissal
of Count I as to the 23 SAEs.  The First Circuit agreed,
however, with this Court's conclusion as to the FDA Action
Letters and the FDA Warning Letter, affirming this Court in both
instances.

While the First Circuit applied Fed. R. Civ. P. 8(a), it
took no position as to whether that rule or Fed. R. Civ. P. 9(b)
is the appropriate standard of review, reserving that
determination for this Court on remand.

## 2.   Sections 12 and 15 Claims

With respect to plaintiffs' second and third arguments
challenging this Court's determination that the SAC failed to
plead a cause of action under § 12, the First Circuit noted that
§ 11 and § 12 are Securities Act "siblings" with roughly
parallel elements such that if § 11 claims survive, § 12 claims
do as well.  Moreover, because § 15 liability requires either
§ 11 or § 12 liability, a § 15 claim may also survive.  Thus,
the First Circuit reversed this Court's dismissal of plaintiff's
claims as to §§ 12 and 15.

Notably, the First Circuit did not rule on whether any
defendants are liable under § 12 as "sellers" or "solicitors,"
reserving that determination for this Court on remand.

-18-

## IV.  **Analysis**

On remand, this Court must reconsider whether the omission of the 23 SAEs from Items 303 and 503 are actionable under § 11, § 12 or § 15.  As an initial matter, the Court must determine the applicable pleading standard in this case and whether defendants are statutory "sellers" or "solicitors" under § 12(a)(2).

### A.  **Section 11 Claims**

#### 1.  **Fed. R. Civ. P. 8(a) or Fed. R. Civ. P. 9(b)**

##### a.  **Legal Standard**

Defendants contend that plaintiffs' claims "sound in fraud" and thus are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). Shaw, 82 F.3d at 1223 ("It is the allegation of fraud, not the 'title' of the claim that brings the policy concerns [underlying Rule 9(b)] to the forefront.") (quoting Haft v. Eastland Fin. Corp., 755 F. Supp. 1123, 1133 (D.R.I. 1991)).  Rule 9(b)'s protections apply in order to provide defendants with notice of the plaintiff's claim, to deter "fishing expeditions" and "strike suits" and to "protect defendants from baseless allegations that may damage their reputations." United Air Lines, Inc. v. Gregory, 716 F. Supp. 2d 79, 85 (D. Mass. 2010).

Determining if allegations sound in fraud is not done by reference to a hard and fast rule. See Lenartz v. Am.

-19-

Superconductor Corp., 879 F. Supp. 2d 167, 188 (D. Mass. 2012).

Rather, whether Securities Act claims sound in fraud requires

analyzing the wording and structure of the specific pleading.

See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 374

(S.D.N.Y. 2011).  To find that a § 11 claim sounds in fraud,

courts examine whether the complaint (1) contains only a general

disclaimer of any allegation of fraud, (2) includes "classic

fraud language," (3) contains a non-fraudulent basis for the

claims alleged and (4) separates the factual allegations

underlying fraud and negligence claims. See Lenartz, 879 F.

Supp. 2d at 188.  While pleading a "unified fraudulent scheme"

will invoke Rule 9(b), mere "errant references" to fraudulent

activity will not shift the gravamen of the complaint so as to

require heightened pleading. See In re Direxion Shares ETF

Trust, 279 F.R.D. 221, 229 n.4 (S.D.N.Y. 2012).

### b.  Application

While acknowledging that the issue is a close one, the

Court finds that the SAC does not sound in fraud such that it

would be subject to a heightened pleading standard under Fed. R.

Civ. P. 9(b).

On the one hand, several factors weigh against such a

finding.  Plaintiffs use language that could imply knowledgeable

conduct, including that defendants "underreported",

"understated", "minimized" and "sought to downplay" the incident

rate of SAEs, made "deceptive" statements about the 23 SAEs
being "within label" (i.e. covered by preexisting warnings) and
"concealed" material facts from investors.  Moreover, plaintiffs
also seem to imply accusations of fraud by remarking that the
timing of the disclosure of SAEs occurred "mysteriously".

On the other hand, viewing the SAC as a whole and parsing
its particular allegations compels the opposite conclusion.  As
an initial matter, most of the claims in the SAC suggest
"materially false and misleading written statements" that are
proscribed by the Securities Act. See In re Refco, Inc. Sec.
Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (noting that
courts cannot intend "that all allegations directly reproducing
the language of § 11 be subject to Rule 9(b)").  The words
"fraud" and "intent" do not appear in the SAC and it relies
explicitly on claims of "negligence" and the failure to exercise
reasonable care.  Moreover, a reasonable, non-fraudulent basis
exists for plaintiffs' claims. See Lenartz, 879 F. Supp. 2d at
188-89.

While several phrases utilized in the SAC often imply
knowledgeable conduct, they are not always so construed.
Indeed, one can underreport, understate, minimize and make
deceptive statements negligently and without nefarious purpose.
Cf. In re Refco, 503 F. Supp. 2d at 632 ("[T]he mere fact that a
statement is misleading (as are all false statements, whether

intentionally, negligently or innocently made) does not make it fraudulent.").

Other statements in the complaint more strongly imply intentional conduct but yet fall short of causing the SAC to sound in fraud. While "concealment" seems to imply purposeful conduct, the First Circuit has noted that

> [t]he Oxford English Dictionary refers to both a common usage of keeping secret of any information and a legal usage of intentional suppression of truth.

United States v. Caraballo-Rodriguez, 480 F.3d 62, 71 (1st Cir. 2007) (stating that neither the Oxford English Dictionary nor Black's Law Dictionary "compels one reading of the term 'conceals'...."); see also Black's Law Dictionary 306 (8th Ed. 2004) (distinguishing "concealment" from "fraudulent concealment"). The phrase "sought to downplay," read in context in the SAC, clearly is not an allegation of fraud in the Offering but rather a comment on the rate of SAE instances which, in any event, occurred nine months after the Offering. Finally, while the Court cannot ignore the insinuation of the word "mysteriously," it declines to construe an allegation of fraud from a lone adverb in a 57-page complaint. This is not a case where the allegations actually "sound in fraud." In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 12 (D. Mass. 1999).

-22-

Accordingly, the Court declines to apply the heightened pleading standard of Fed. R. Civ. P. 9(b) to the SAC and, instead, will apply the standard of Rule 8. Moreover, because the First Circuit has determined that the SAC passes muster under that Rule, it need not be addressed by this Court. Defendants' renewed motion to dismiss the claims under § 11 will therefore be denied.

**B.    Section 12(a)(2) claims**

Plaintiffs allege that AMAG, individual defendants Pereira and Arkowitz and the underwriter defendants all violated § 12(a)(2) by selling or soliciting the sale of AMAG stock pursuant to Offering Documents that omitted material facts. In response, defendants argue that to survive a motion to dismiss, plaintiffs must allege as to each defendant that each plaintiff purchased his shares directly from that particular defendant or that the defendant was directly involved in the actual solicitation of his specific purchase. Because plaintiffs purportedly do not allege either scenario, their claims under § 12(a)(2) should be dismissed, say defendants.

**1.    Defendants as Statutory "Solicitors"**

**a.    Legal Standard**

Section 12(a)(2) imposes liability on any person who offers or sells a security by means of a prospectus which includes an untrue material statement or omits a material fact. 15 U.S.C.

-23-

§ 77l(a)(2).  Section 12(a)(2), however, only allows a suit to proceed against a defendant from whom a plaintiff purchased a security or who "successfully solicited the sale of that security for financial gain." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 776 (1st Cir. 2011) (citing Pinter v. Dahl, 486 U.S. 622, 642-47, 65 & n.21 (1988)).

The mere selling of stock does not convert a seller into a solicitor. Pinter v. Dahl, 486 U.S. 622, 651 (1988) ("[P]roof the defendant caused a plaintiff's purchase of a security is not enough to establish that the defendant 'solicited' the sale for Section 12 purposes.").  In Shaw, the First Circuit held that

> neither involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status.

Shaw, 82 F.3d at 1216.  Accordingly, allegations that a defendant only "signed the offering materials or participated in the making of the registration statements" are insufficient to survive a motion to dismiss. In re Evergreen Ultra Short Opportunities Fund Sec. Litig., 705 F. Supp. 2d 86, 96 (D. Mass. 2010).

### b.    Application

Initially, the Court notes that the underwriter defendants are statutory sellers under § 12(a)(2).  The only question before the Court is whether plaintiffs' allegations are factually sufficient with respect to the precise underwriter defendant who sold shares of AMAG to a particular plaintiff.

The Court finds that plaintiffs' allegations are sufficient to clear the hurdle posed at this stage of the litigation.  As plaintiffs point out, other courts in this district, subject to the same binding precedents as is this Court, have found complaints sufficient in light of allegations with respect to "all underwriter defendants." See Transkaryotic Therapies, Inc. Sec. Litig., 319 F. Supp. 2d 152, 158 (D. Mass. 2004). Moreover, plaintiffs allege the specific number of shares sold and underwriting fees received by each underwriter defendant. Although the SAC does not have a high level of factual specificity with respect to each precise transaction, the Court infers such relationships based on the information provided at this juncture in the case. See Nomura Asset Acceptance Corp., 632 F.3d at 776 (reversing dismissal of "plaintiffs' section 12(a)(2) claims for failure to allege defendants' requisite connections with the sale").

Accordingly, the Court finds sufficient factual specificity in the complaint for plaintiffs' claims under § 12(a)(2) to

proceed against the underwriter defendants.  The Court need not

address whether the underwriter defendants could also be

considered "solicitors" under § 12(a)(2).

The Court's inquiry with respect to AMAG and individual

defendants Pereira and Arkowitz, however, is whether they can be

considered "solicitors" under § 12(a)(2).  Plaintiffs allege

that AMAG, Pereira and Arkowitz prepared the Offering Documents

and "actively solicited" the sale of stock through

> preparation and dissemination of the Prospectus,
> participating in road shows, and the planning and
> orchestrating of all activities necessary to promote
> the sale....

The Court concludes that the complaint contains sufficient

factual specificity to survive a motion to dismiss with respect

to the "solicitor" status of defendants AMAG, Pereira and

Arkowitz.  Plaintiffs allege participation in producing the

Prospectus and in activities related to the promotion of the

sale of stock. Cf. Shaw, 82 F.3d at 1216 (holding that "neither

involvement in preparation of a registration statement or

prospectus nor participation in 'activities' relating to the

sale of securities, standing alone" is sufficient to survive a

motion to dismiss).  Drawing all reasonable inferences in favor

of plaintiffs, those allegations are sufficient to infer that

AMAG, Pereira and Arkowitz solicited the sale of AMAG stock.

Moreover, although the matter is debatable, this Court has determined that, with one exception not invoked here, "Section 12(a)(2)...contains no reliance element." In re Evergreen Ultra Short Opportunities Fund Sec. Litig., 275 F.R.D. 382, 389 (D. Mass. 2011); but see PaineWebber, Inc., 2001 WL 740764, at *2 (requiring a § 12(a)(2) plaintiff to allege that he "purchased securities as a result of [the defendant's] solicitation"). The Court sees no reason to depart from its earlier determination based both on the text of the statute and the purpose of § 12 as a "broad anti-fraud measure." In re Evergreen Ultra, 275 F.R.D. at 390 (citing Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 344 (2d Cir. 1987)).

Accordingly, the Court finds that plaintiffs have alleged sufficient facts at this juncture in the litigation to survive a motion to dismiss with respect to their § 12(a)(2) claims against defendants AMAG, Pereira and Arkowitz.

## C.    Section 15 claims

Section 15 imposes "control liability" premised on a primary violation of either § 11 or § 12. Aldridge, 284 F.3d at 85. Here, because the Court finds sufficient allegations to deny defendants' motions to dismiss with respect to the claims under § 11 and § 12, the claims under § 15 survive as well.

**ORDER**

For the foregoing reasons, the motions to dismiss of AMAG (Docket No. 90) and the Underwriter Defendants (Docket No. 93) are **DENIED.**


**So ordered.**

/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated April 7, 2014